(No. 52388.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. FARRIS WALKER, Appellant.

*Opinion filed June 1, 1982.—Rehearing denied*
*October 1, 1982.*

Patrick T. Driscoll, Jr., of Chicago, and John G. Quirk, James E. Doherty, David J. O'Keefe, and William H. Hrabak, law students, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attor-

neys, of counsel), for the People.

CHIEF JUSTICE RYAN delivered the opinion of the court:

By information filed in the circuit court of Cook County, Farris Walker was charged with the murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and attempted armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 8—4) of Raphael Morrow. At the conclusion of the trial, the jury returned a verdict of guilty on both counts. The prosecutor requested a hearing to determine whether the death penalty should be imposed. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) A new jury was chosen to hear evidence concerning aggravation and mitigation. The jury found that the victim was murdered "in the course of an armed robbery," which is an aggravating factor which supports the death penalty under the statute. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)(c).) The jury also found no mitigating factors existed to preclude the imposition of the death penalty. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(c), (g).) The trial judge entered judgment sentencing the defendant to death. The defendant was also sentenced on the attempted-armed-robbery conviction. The sentence was stayed (73 Ill. 2d R. 609(a)), pending direct appeal to this court, pursuant to Rule 603 (73 Ill. 2d R. 603). For the reasons expressed in this opinion, we affirm the convictions and the attempted-armed-robbery sentence, but vacate the sentence of death and remand for a new penalty hearing on the murder conviction.

On the evening of January 2, 1978, Raphael Morrow, an 86-year-old man, was on the Granville elevated station platform in Chicago. The ticket agent for the Chicago Transit Authority testified that she heard a train stop and saw an elderly man walking quickly down the stairs from the platform. After he left the station she heard someone scream and she called the dispatcher requesting that the police be summoned. A short time later she heard the

door to the stairway open and she heard a voice say "give me your wallet."

Two uniformed police officers, Thaddeus Dudek and William Morley, entered the station and proceeded up the stairs to the platform. The officers saw the elderly victim sitting on the floor of the platform with his back to the wall and his legs straight out. Standing straddled over the victim and facing him was the defendant, who had a knife in his right hand. Officer Dudek said "Jimmy, he's got a knife." Defendant looked up at the officers, who told him to stay where he was. The defendant turned and fled through the doors that led to the platform. Officer Dudek followed him, and Officer Morley went through the other set of doors. After a short chase, the officers subdued the defendant, handcuffed him, advised him of his rights, and escorted him back into the station.

Officer Dudek asked the victim how he felt, and the man responded that he "felt OK." The victim looked at Officer Morley and at the defendant and said, "That's him, I'm glad you got the guy that did this to me."

Officer Christine Erengis testified that when she arrived the victim was "bleeding very heavily." He pointed to the defendant, saying "that's, you know, the man who tried to rob me." The victim also told Officer Erengis that he did not carry a wallet.

Raphael Morrow died the next day. Doctor Lee Beamer, the pathologist who performed the autopsy, found nine stab wounds and three slash wounds. The cause of death was multiple stab wounds.

The defendant challenges the constitutionality of our death penalty statute on several grounds. We need not address those challenges in this opinion as they have been passed on by this court in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. The only error the defendant raises in relation to his convictions is that the State failed to produce certain evidence favorable to him prior to trial in

response to his discovery motion, in violation of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and our Rule 412 (73 Ill. 2d R. 412). During the guilt or innocence phase of the trial, the assistant State's Attorney tendered certain Chicago Police Crime Laboratory reports and a police report which stated that the defendant had a "crushed green plant" on his person at the time of his arrest. The defendant claims that these reports were favorable to him and, therefore, should have been produced pursuant to his discovery requests prior to trial.

The State argues that the defendant cannot now claim prejudice regarding discovery materials he received at trial and used, particularly since the defendant made no claim of prejudice at trial and failed to request a continuance or a recess. Also, the State points out that the defendant failed to use any of the reports a month later at the sentencing hearing. The defendant was given all laboratory reports the day before Mr. Spreyne, the State's expert microanalyst, testified. The day Mr. Spreyne testified, defense counsel acknowledged receipt of the reports for the record and stated only that he had not previously received some of the reports. The reports that the defendant apparently had not received were subgrouping tests of the blood samples, which, for the most part, proved inconclusive. The State then called Mr. Spreyne to testify with no objection from defense counsel, no request for a continuance for more time to prepare, and no suggestion that the defendant would be prejudiced in any manner. In fact, defense counsel cross-examined the State's microanalyst using the reports he now claims "surprised" him. He used the reports on cross-examination to establish that the victim's blood was subgroup "MN," while the subgrouping of the blood taken from the elevated station floor, though inconclusive because it was an extremely weak sample, contained only the "M" antigen. These two samples represented the only subgrouping tests performed.

If the reports were "so earthshaking as to require complete reorganization of the defendant's case, counsel should have asked for a continuance or recess for that purpose before [Spreyne] testified. His failure to do so is persuasive evidence that the prejudice here alleged was in fact trivial." (*People v. Foster* (1979), 76 Ill. 2d 365, 384.) The defendant should not be permitted to adopt one strategy and, when it fails, seek the drastic remedy of reversal of a conviction when more moderate corrective measures available during the trial were not utilized, and indeed were not requested. Any claimed prejudice at this late date is purely afterthought and certainly conjectural.

The defendant next contends that the police report which indicates the defendant possessed a "crushed green plant" was exculpatory evidence because he had claimed a "possible drugged or intoxicated condition" as an affirmative defense. Also, the defendant argues that this report could have been used as a mitigating factor during the penalty phase of the trial, in combination with the defendant's own testimony that he had smoked marijuana the night that Raphael Morrow was murdered.

As with the laboratory reports discussed above, the defendant here also did not claim surprise or ask for a continuance or a recess to further investigate the contents of the police report or prepare his defense in relation thereto. The defendant's position was not that he was in a drugged condition but that he did not kill Raphael Morrow. He did not testify at the guilt phase of the trial. However, at the penalty hearing he testified he had seen the deceased slumped over on the station platform with blood coming from his mouth and side. As he approached him, Morrow started swinging at him with a knife. The defendant took the knife away from him and set Morrow down against the wall. The defendant had the knife in his hand when the police arrived. He cannot now claim he was prejudiced in that the earlier knowledge of the

"crushed green plant" would have aided him in fabricating a completely different story. The defense of a drugged or intoxicated condition would involve an acknowledgment that the defendant killed Morrow, or at least not a denial that he did so, which is completely contrary to the position the defendant has taken. We will not find that the defendant has been prejudiced in the guilt phase of his trial because he was not aided in subverting the process. The defendant testified at the sentencing hearing a month later that he had smoked marijuana the night Raphael Morrow was killed, but defense counsel did not use or attempt to use the police report indicating that the defendant had in his possession a "crushed green plant."

To prove a violation of *Brady v. Maryland*, the defendant must show that certain material evidence not produced was favorable to the defendant. "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." (*United States v. Agurs* (1976), 427 U.S. 97, 104, 49 L. Ed. 2d 342, 350, 96 S. Ct. 2392, 2398.) The above discussion clearly shows that this test has not been met in this case.

Not only defendant's failure to request more time for preparation and his use of the reports, but also his failure to use the reports to support his position at the penalty hearing one month later, demonstrate that any delay in learning of the information could not have prejudiced this defendant or affected the outcome of the trial. (*United States v. Agurs* (1976), 427 U.S. 97, 104, 49 L. Ed. 2d 342, 350, 96 S. Ct. 2392, 2398.) If the contents of the reports were favorable, the defendant surely would have used them at the penalty hearing.

The defendant also argues that our statute does not include attempt in the list of enumerated aggravating factors which trigger eligibility for the death penalty. The

statute states:

> "(b) Aggravating factors. A defendant *** who has been found guilty of murder may be sentenced to death if:
>
> * * *
>
>> 6. the murdered individual was killed *in the course of another felony* if:
>>
>> * * *
>>
>>> (c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)(c).)

The defendant argues that his conviction for the attempted armed robbery of Raphael Morrow cannot form the basis for the imposition of the death penalty. He interprets the phrase "in the course of another felony" to include only situations where one of the enumerated felonies has been completed. He asserts, therefore, that since he was convicted of *attempted* armed robbery, not armed robbery, he did not commit murder "in the course of another felony." Hence, according to defendant, no statutory aggravating factor exists to make the murder of Raphael Morrow a capital offense.

The statute does not require that the accused be convicted of the commission of one of the listed aggravating felonies. Whether the murder is committed in association with the actual completion of the aggravating felony or only with the attempted felony is not crucial. The aggravating factor which triggers the application of the death penalty statute is that the murder be committed *"in the course of"* the aggravating felony. A murder may be committed "in the course of" an armed robbery whether or not the actual armed robbery is consummated.

An essential element of an attempt is that the accused perform "any act which constitutes a substantial step toward the commission of that offense." (Ill. Rev. Stat. 1977, ch. 38, par. 8—4.) It is a question of fact whether "[an] act which constitutes a substantial step toward the commission

of" armed robbery constitutes "in the course of" an armed robbery, so that that act becomes an aggravating factor authorizing the imposition of the death penalty. We again emphasize that the death penalty statute specifies as an aggravating factor that the murder be committed "in the course of" one of the listed felonies. The statute does not require that the other felony be completed or that the defendant be charged with or convicted of the other felony or an attempted felony.

The death penalty statute does require the State to prove beyond a reasonable doubt (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(f)) the aggravating factor, that is, that the murder was committed "in the course of" the armed robbery (or other specified felony). This is so whether the defendant has been convicted of armed robbery (or another specified felony), or of attempted armed robbery. It is establishing that the murder was committed "in the course of" the armed robbery in our case that makes the defendant eligible for the death penalty, not the commission of an armed robbery or an attempted armed robbery. The sentencing jury in the first phase of the sentencing hearing in this case found that the murder was committed "in the course of" an armed robbery.

The Georgia Supreme Court reached a similar conclusion in *Amadeo v. State* (1979), 243 Ga. 627, 255 S.E.2d 718. The Georgia death penalty statute states that a statutory aggravating factor is established where:

> "The offense of murder *** was committed while the offender was engaged in the commission of another capital felony ***." (Ga. Code Ann. sec. 27—2534.1(b)(2) (1975 Supp.).)

In *Amadeo* the jury found that the murder was committed "while the offender was engaged in the commission of another capital offense, to-wit: Armed Robbery." (*Amadeo v. State* (1979), 243 Ga. 627, 630, 255 S.E.2d 718, 721.) The defendant walked up to a truck, armed with an automatic weapon, and demanded the driver's money. He shot the driver and fled without taking the money. The court stated:

"The 'while \*\*\* engaged in the commission of' requirement of that subsection does not require that the subject felony shall have been completed or that the offender shall have been charged with or convicted of the felony." (*Amadeo v. State* (1979), 243 Ga. 627, 630-31, 255 S.E.2d 718, 721.)

The court concluded that the defendant was clearly engaged in the commission of another capital offense—armed robbery—when he killed the man.

The defendant also argues that if the legislature had intended to include "attempt" in the statutory aggravating factors it could have easily done so, as it did in the felony-murder provisions of section 9—1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(3)). This misconstrues the fact that the statutory aggravating factor is, as noted above, not the conviction of armed robbery or attempted armed robbery, but murder "in the course of" armed robbery. It is true, of course, that some of the same facts may go to prove both the attempted felony and the aggravating factor because one of the elements of "attempt" is taking a substantial step toward the commission of a crime (Ill. Rev. Stat. 1977, ch. 38, par. 8—4(a)).

In summary, section 9—1(b)(6) of our death penalty statute requires only that the State prove beyond a reasonable doubt, *inter alia*, that the murder was committed in the course of one of the felonies enumerated in section 9—1(b)(6)(c). The phrase "in the course of" does not require that the defendant complete one of the enumerated felonies or that he be charged and convicted of any offense other than murder to be eligible for the death penalty. In this case the State had to prove, *inter alia*, beyond a reasonable doubt that the defendant murdered Raphael Morrow in the course of the armed robbery.

The defendant has raised numerous errors relating to his sentencing hearing, most of which need not be addressed in light of our holding that the cumulative effect of some of the errors requires remandment for a new sentencing hear-

ing. We hold that the prosecutor's remarks in closing argument that the defendant would be eligible for parole and the judge's failure to sustain the defendant's objection to those remarks, plus the judge's *ex parte* handling of a question from the jury concerning parole, require that the death sentence be vacated and a new sentencing hearing be held.

In rebuttal closing argument, the prosecutor told the jury:

> "As you heard when he committed the crime of killing an 87 year old man, he was on parole. Mr. Walker does not fear the penitentiary system. He did not fear violating any of his parole by robbing people. He has no fear of the penitentiary system. And Mr. Radakovich [defense counsel] would put him in prison for the rest of his life. But Mr. Radakovich knows under the law that is available he is eligible for parole again ——

> MR. SACKS [Defense Counsel]: Objection, Your Honor.

> PROSECUTOR: (Continuing)—in eleven years.

> MR. SACKS: Objection, Your Honor.

> PROSECUTOR: That is the law.

> THE COURT: You may continue.

> PROSECUTOR: And he knows that. But they don't tell you that, do they?

> And he spent over a year in jail. He has no fear that he will not see the streets again, because he is going to prey on your weaknesses, that you do respect human life and because you respect life you will not take his. You cannot allow that to happen, because if you do the only thing that is certain is there will be other victims. But as of yet they are unknown, unnamed, and unrepresented in this case. But they will exist."

The defendant argues that these comments prejudiced the defendant, requiring reversal of his death sentence. The defendant contends that the prosecutor's remarks introduced the prejudicial consideration of the defendant's possible parole into the jury's sentencing decision. The defendant also argues that the judge should have sustained the objection and admonished the jury to disregard the comment.

The State's position is that the prosecutor's closing comments were invited by the following remarks of defense counsel:

"[Mr. Walker] will be sentenced by his Honor, Judge Machala and not by you to a term of years in the penitentiary. He is going to be living in a cage and everything else about a prison. ***

* * *

*** And don't count on somebody else changing your decision, because each and everyone of the twelve of you are judging, each and everyone of the twelve of you has that power to either to give him life in the penitentiary,— life but in a penitentiary. He is not getting away with anything. Each and everyone of the twelve of you has the power to kill."

The defendant relies on *People v. Lynn* (1944), 387 Ill. 549. In *Lynn* the prosecutor informed the jury that the Board of Pardons would take into consideration that the defendant had just finished serving a prison sentence and for that reason would probably require that the defendant serve only one year. The trial court sustained an objection and admonished the jury to disregard the comment. The State argued that the comments were invited by defense counsel's closing argument to the jury. The court reversed the conviction, stating that the State's argument was not supported by the record in the case.

In this case, however, the record reflects that the prosecutor's closing argument comments concerning parole came very close to being invited by defense counsel's own argument. In *People v. Myers* (1966), 35 Ill. 2d 311, the prosecutor, during closing argument in a death penalty case, stated: "Are you going to gamble in a few years he will find no psychiatrist saying that John Myers [defendant] is psychotic? If the inevitable takes place you have given him the gun and said good boy, John, go out and kill another ***." The court stated that the prosecutor's comment "was a legitimate reply which was invited by the defendant's argument." (*People v. Myers* (1966), 35 Ill. 2d 311, 335.) It held that the com-

ments were not prejudicial error requiring reversal.

Were it not for the fact that, as demonstrated later by the inquiry made by the jury to the judge, these remarks obviously caused the jury to consider whether the defendant would be eligible for parole, we could find that the remarks were invited and not grounds for reversal. However, here we are dealing with the penalty of death, which demands strict scrutiny of such remarks and their possible effect upon the sentencing jury. The United States Supreme Court has held that in determining whether death is the appropriate punishment in a given case, the focus should be upon the character and record of the offender, as well as the facts and circumstances surrounding the offense. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304-05, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *Lockett v. Ohio* (1978), 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 989-90, 98 S. Ct. 2954, 2964-65.) If, in considering the individual and the offense, the jury concludes that the defendant is not such a person as should be executed, then the fact that he may eventually be paroled by the executive branch of our State government does not mean that he should be executed to prevent that possibility. By injecting the parole consideration into the penalty determination, the jury is diverting its attention from the offense and the offender, and is focusing upon a speculative possibility that may or may not occur. (*People v. Morse* (1964), 60 Cal. 2d 631, 644-45, 388 P.2d 33, 41, 36 Cal. Rptr. 201, 209; *People v. Ramos* (1982), 30 Cal. 3d 553, 591-96, 639 P.2d 908, 929-33, 180 Cal. Rptr. 266, 287-91.) Our statute requires that the court or jury, as the case may be, consider aggravating and mitigating factors, which are relevant to the imposition of the death penalty. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).) Whether or not the defendant may, at some future time, be paroled is not a proper aggravating factor to consider in determining whether the death penalty should be imposed.

That the comments of counsel did raise the question of

whether the defendant could be paroled if he were sentenced to prison is apparent from the contents of the note which the jury sent to the judge during its deliberation. The note stated:

> "Judge Machala
>
> We, the Jury, were wondering that if we should find that the defendant should serve time in prison—if we have the right and/or authority to be assured that the defendant cannot walk the streets again—determine if he should receive life or 100-999 yrs. where he <u>cannot</u> receive parole at such an age where he <u>cannot</u> again do harm to others. Is there a rule where on the books Please advise." (Underscoring in the note.)

The defendant's position is that this note demonstrates that at least one juror was concentrating on the prosecutor's closing argument comments on parole. The judge responded *ex parte* by sending the jury a note which stated "a verdict must be arrived at on the basis of the evidence you have been given."

The defendant contends that the judge's *ex parte* communication with the jury is error in and of itself requiring reversal. We reject this position. A communication to the jury, either by the court or by a third person, does not always require setting aside the verdict "where it is apparent that no injury or prejudice resulted ***." *People v. Mills* (1968), 40 Ill. 2d 4, 14; *People v. Brothers* (1932), 347 Ill. 530, 548.

There were present at the penalty hearing three errors which, although individually may have been considered harmless, collectively require that the penalty be vacated. The comments by the prosecutor in closing argument, the failure of the court to sustain objections to the comments, and the *ex parte* communication by the judge to the jury

which did not respond to the jury's question combine to require this result. Under these facts it is not "apparent that no injury or prejudice resulted" (*People v. Mills* (1968), 40 Ill. 2d 4, 14). Taken together these events present the very real possibility that the jury was led to believe that whether or not the defendant would ultimately be paroled was a proper matter for them to consider in determining whether the death penalty should be imposed. This belief was not dispelled by the perfunctory response of the judge in his *ex parte* communication.

Since this is a death penalty case, a high standard of procedural accuracy is required in determining whether or not that penalty will be imposed. The procedural errors in this case do not conform to the high standard which must be followed to insure that proper matters are considered in aggravation and that the penalty is applied in as uniform a manner as possible within the framework of an adversary proceeding.

While we affirm the defendant's convictions for murder and attempted armed robbery and the sentence for attempted armed robbery, we must vacate the sentence of death and remand the cause to the circuit court of Cook County for a new penalty hearing on the murder conviction.

*Affirmed in part and vacated*
*in part; cause remanded,*
*with directions.*