(No. 80967.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ERNEST D. JAMISON, Appellant.

*Opinion filed April 19, 2001.—Rehearing denied October 1, 2001.*

138

HARRISON, C.J., concurring in part and dissenting in part.

Charles Schiedel, Deputy Defender, and Charles Hoffman, Assistant Defender, of the Office of the State Appellate Defender, and Richard P. Steinken, Scott T. Schutte and Elizabeth A. Coleman, of Jenner & Block, all of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Charles Reynard, State's Attorney, of Bloomington (Barbara A. Preiner and Joel D. Bertocchi, Solicitors General, and William L. Browers and Arleen C. Anderson, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, Ernest D. Jamison, was convicted on a plea of guilty to first degree murder (720 ILCS 5/9—1(a)(1) (West 1994)) and armed robbery (720 ILCS

5/18—2 (West 1994)) in connection with the June 19, 1995, shooting death of Susan K. Gilmore. He was found eligible for the death penalty and sentenced to death. Defendant's death sentence was stayed pending his appeal, which came directly to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609. On direct appeal, this court determined that defendant had not been properly admonished in accord with Supreme Court Rule 605(b). While retaining jurisdiction over the appeal, we remanded the matter to the circuit court of McLean County so that defendant, after being properly admonished, would have the opportunity to file a motion to withdraw his plea of guilty, as provided in Supreme Court Rule 604(d). See *People v. Jamison*, 181 Ill. 2d 24 (1998).

On remand, defendant filed a motion to withdraw his guilty plea, which the circuit court denied. The matter now is returned to this court for further review. For the reasons that follow, we affirm defendant's convictions and sentence.

## I. BACKGROUND

The record shows that, in the early morning hours of June 19, 1995, defendant shot and killed a man in Memphis, Tennessee. Using this man's automobile, defendant fled the state and headed toward Minnesota. While driving through Missouri, defendant shot and killed a gas station attendant.

The stolen vehicle defendant was driving broke down in Illinois. Defendant abandoned that vehicle near a Quick Pic store in McLean, Illinois. He then approached the gas pumps at the front of that store, where Susan Gilmore had just filled her car with gasoline. Defendant walked to within three feet of Gilmore, pulled out a gun, shot Gilmore in the head, and pulled her body out of the car. Defendant then drove away in Gilmore's car. Soon after, a McLean County sheriff spotted defendant and pursued him in a high-speed car chase. Defendant's vehi-

cle swerved into a ditch. When the sheriff approached defendant's car, defendant apparently attempted suicide by shooting himself in the head.

On July 13, 1995, defendant was indicted in the State of Illinois on three counts of first degree murder in relation to the shooting of Susan Gilmore and one count of aggravated vehicular hijacking. The indictments charged that, on June 19, 1995, defendant knowingly and without lawful justification caused the death of Susan Gilmore by shooting her in the head with a handgun and that he "took a motor vehicle, a Honda automobile, from the presence of Susan Gilmore by the use of force when he was armed with a dangerous weapon, a handgun." On July 21, 1995, defendant was arraigned and entered a plea of not guilty.

On July 25, 1995, while being held in the McLean County detention facility, defendant was seen for the first time by Dr. Bhaskar Damera, a psychiatrist. Dr. Damera determined that defendant was experiencing feelings of boredom and loneliness because he had been rendered blind by a self-inflicted gunshot wound in a failed apparent suicide attempt. Dr. Damera diagnosed defendant as having "Major depression, single episode" and prescribed Sinequan,[1] a psychotropic medication.

In August 1995, defendant advised his attorney he wished to change his plea to guilty. A hearing was scheduled for September 1, 1995. At the September 1, 1995, hearing, the State notified the court that, by information, it was adding a charge of armed robbery to the pending charges against defendant. In this new fifth count (count V), it was alleged that defendant "knowingly took the contents of a motor vehicle, said contents belonging to Susan K. Gilmore, and including clothing and personal effects and plants and tapes, from the im-

[1]The drug, Sinequan, also is known by the names Adepin and doxepin.

mediate presence of Susan Gilmore by the use of force when he was armed with a dangerous weapon, a handgun."

The court advised defendant that, before proceeding further, he was entitled to have a grand jury return an indictment on count V or he could have a preliminary hearing to determine probable cause for the filing of count V. Defendant waived these rights and, on the same day the information was filed, entered a plea of guilty to count I, intentional murder, and to count V, the newly filed armed robbery count.

Before the court accepted defendant's plea, defense counsel advised the court that defendant was taking "an anti-depressant, Sinequan," which was prescribed for him by Dr. Damera. Counsel further informed the court that she had spoken with Dr. Damera "with regard to the effects of Sinequan as far as Mr. Jamison's judgment, his ability to understand and communicate with regard to his case, and any other effects that the medication might have on him, and was informed that in fact [defendant] should react in a normal fashion. That the only obvious effect would be to deal with his depression, to some extent help him sleep." Defense counsel then added, "And I believe from communicating with my client on a regular basis, that in fact there is no negative influence insofar as his judgment is concerned and that he is alert."

The trial court then admonished defendant in accord with Supreme Court Rule 402, found that defendant's plea was knowingly and voluntarily made, and accepted defendant's plea of guilty to first degree murder and armed robbery after hearing the State's factual basis. The State advised the court that it intended to seek the death penalty and defense counsel acknowledged awareness of the State's intention.

Defendant waived his right to a jury and, on Decem-

ber 4, 1995, a bench trial was held to determine defendant's eligibility for the death penalty. Three witnesses testified at this first-stage hearing. The clerk at the Quick Pic store testified to the events leading up to the shooting of Susan Gilmore on June 19, 1995, and defendant's departure in Gilmore's car. A McLean County sheriff testified to the events leading up to defendant's capture, and to defendant's oral confession to the shooting. The sheriff also testified that audio tapes, plants, and other items were found inside the car defendant was driving when he was arrested. Finally, Gilmore's son testified that on June 19, 1995, he had been living with his mother in Rockford. At about 8 a.m. that day, he saw his mother loading up her car, a blue Honda Accord, with plants and other items, in anticipation of a planned visit to his aunt's home in Kansas City. That was the last time he saw her alive.

After hearing the evidence, the trial court found defendant eligible for the death penalty pursuant to section 9—1(b)(6)(c) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(6)(c) (West 1994)). After determining defendant's eligibility for the death penalty, the court proceeded to the second stage of the death penalty hearing and began to receive evidence in aggravation and mitigation. Additional evidence was presented on December 5 and 7, 1995, and on February 9, 13, 14, 15, 16, and 21, 1996.

On the morning of February 15, 1996, defense counsel informed the court that she would be asking her next witness, Dr. Arthur R. Traugott, "some basic questions with regard to fitness." She explained that at the time of the plea hearing, on September 1, 1995, no one was aware that defendant had been taking medication which was classified as psychotropic. Upon learning the psychotropic nature of the medication, she contacted Dr. Damera, defendant's treating psychiatrist, and Dr. Traugott, a

psychiatrist she had engaged as a mitigation witness. Dr. Traugott, whom she planned to call as her next witness, was prepared to testify on the subject of defendant's fitness while taking medication.

It was noted by the trial court that, based on the statutory provision in effect at the time defendant entered his plea, defendant's use of psychotropic medication entitled him to a fitness hearing. That statute, however, had been recently amended, requiring a fitness hearing only if a *bona fide* doubt of defendant's fitness existed. Due to the change in the law, there was a consensus among the court, the State, and defense counsel that evidence regarding defendant's fitness should be placed on the record. Defense counsel then stated:

> "And while I don't believe at any point in these proceedings, including the time of the defendant's arrest, that there was any *bona fide* doubt with regard to his fitness, and certainly there hasn't been as far as I'm concerned with my communications with him throughout the proceeding, I feel more comfortable having some testimony with regard to that."

Dr. Traugott then testified that he performed a psychiatric evaluation of defendant on November 15, 1995. At that time, defendant was taking the drug, Sinequan, as prescribed by Dr. Damera. Dr. Traugott testified that he saw no evidence that the medication affected defendant's ability to understand the charges or cooperate with his defense. Rather, Dr. Traugott was impressed by the clarity with which defendant was able to recall and articulate events, including the events of the plea hearing on September 1, 1995.

Dr. Traugott further testified that he had reviewed numerous documents, including the psychiatric reports prepared by Dr. Damera both before and after the plea hearing. Based on all the information available to him, in addition to his own expert knowledge of, and experience

with, the drug Sinequan, Dr. Traugott believed the medication had no negative effect on defendant's intellectual functioning. In fact, Dr. Traugott testified, "I think, if anything, that the Sinequan may have enhanced [defendant's] ability to cooperate and assist in those proceedings." Dr. Traugott explained that Sinequan ameliorates the symptoms of depression, such as sleep and appetite disturbance, and helps the person become more focused and better able to concentrate. For all these reasons, Dr. Traugott concluded that defendant was fit for sentencing and had been fit at the time he entered his plea.

In addition to rendering his opinion on defendant's fitness, Dr. Traugott informed the court that his primary diagnosis was that defendant suffered from antisocial personality disorder, affective aggressor type. Dr. Traugott explained that affective aggressors tend to react impulsively when they feel threatened or under stress.

Dr. Alvin House, a clinical psychologist, also testified in mitigation. He testified that he met with defendant on November 1 and 8, 1995, and January 5, 1996, and on those occasions, performed a series of tests to assess defendant's intellect and mental functioning. Due to defendant's blindness, only the verbal portion of the Wechsler Intelligence Test could be administered. Based on this limited test, defendant's IQ was determined to be 80, which is below average. However, Dr. House also administered the Wechsler Memory test, which measures short-term and long-term memory and memory function. This test produced an index number of 102, which is within the average range. Dr. House testified:

"In terms of cognitive abilities, on each of the occasions I met with [defendant], [he] performed elements of a mental status assessment looking at his tempo orientation, his attention, different less comprehensive types of short-term recall task[s] like the Wechsler's. Each time [defendant] showed a clear mental status. He was consistently oriented

within the normal range. He showed some lapses of attention, but in general was able to focus on me and my questions for the periods I met with him, and appeared to be alert and competent."

Dr. House was aware that defendant was taking Sinequan for depression. Dr. House was familiar with the drug and testified that Sinequan can affect short-time reading and recall, but does not typically affect the type of performances measured on an intelligence test. He noted, too, that depression can also interfere with mental performance. In Dr. House's opinion, because defendant scored within the normal range on the Wechsler Memory tests, "what was likely going on was that the benefits that [defendant] was deriving from the medication were outweighing any effects it was having on his cognitive functioning."

Dr. House noted that on his January 8, 1996, visit, defendant reported feeling better and he acknowledged that the medication seemed to be helping him. Still, defendant became sad when he spoke about the future and maintained he would rather die than go to prison because he was afraid of being victimized in prison, due to his blindness.

Based on his examination and testing of defendant, Dr. House reached a determination regarding defendant's mental health using the DSM-IV classification system. He, like Dr. Traugott, diagnosed defendant as having antisocial personality disorder, impulsive type.

Other mitigation witnesses testified. Melinda Meyer Felner, an officer at the McLean County detention facility, testified that defendant was placed in a holding cell directly across from the control room. Initially, defendant was placed there because he was considered a suicide risk, but he remained there due to his blindness. Felner testified that defendant had adjusted well to his situation. He was provided with audio and music tapes, as well as books on tape, to help him alleviate his boredom.

Felner also noted that defendant had begun writing rap songs.

Casey Kruse Goldberg, a social worker at the detention facility, testified that she visited with defendant 16 times, beginning on July 25, 1995. Recognizing that defendant seemed depressed, she referred defendant to Dr. Damera, the facility's psychiatrist. After Dr. Damera placed defendant on medication, defendant's depression seemed to decrease. Goldberg testified that defendant enjoyed "witnessing" his faith to other cellmates and wrote rap songs as a hobby, to help "him think out what was in his head."

Dr. Damera, defendant's treating psychiatrist who had prescribed Sinequan for defendant's depression, testified on February 16, 1996. When asked about defendant's fitness while taking this medication, Dr. Damera explained that the drug is "supposed to uplift your spirits, and it has other affects [sic] such as calming down, anti-anxiety, and also helps you to sleep." Dr. Damera said the drug typically increases a person's self-esteem and brings about greater clarity of thought.

According to Dr. Damera, the dosage defendant received was relatively small—25 milligrams twice during the day and 50 milligrams at night, to aid sleep. On September 19, 1995, the dosage was increased to 100 milligrams at night because defendant was still having difficulty sleeping.

When asked if he had an opinion as to defendant's fitness, Dr. Damera replied:

"Well, I did not examine him specifically with that intent, but in my experience with the patient I never got the impression that he was unfit in any way. He understood everything, our conversation, the treatment, the charges."

The prosecutor then entered into the record the following stipulations: (1) that on the date defendant entered his guilty plea on September 1, 1995, and continuing on through early December 1995, neither the

State nor defense counsel was aware that the medication taken by defendant was classified as psychotropic. The psychotropic nature of the medication was not realized until late December 1995 or early January 1996; (2) that the amendment to the statute (725 ILCS 5/104—21 (West 1996)), which became effective in December 1995 and required a fitness hearing only if there was a *bona fide* doubt as to defendant's fitness, was applicable and, therefore, no fitness hearing was required in this case; and (3) if a higher court should find that the amended statute is inapplicable and a fitness hearing is required, the evidence and testimony already received by the court "is in substance a fitness hearing" which "substantially complies with the statute."

The prosecutor further advised the court that, even before it was known that defendant was taking psychotropic medication, defendant's fitness had been a consideration due to his suicide attempt. He explained, however, "it has been the consistent position of defense counsel in this case, who is in the best position to know that the defendant has been able to understand what has—what is going on in these proceedings, what he is charged with, what the consequences are, and that the defendant has, in fact, been able to fully cooperate with his counsel in these matters, and that is the reason why there has not been a fitness hearing requested by the defense counsel, and there is still not a fitness hearing requested by defense counsel."

The trial court ruled as follows:

"The court would note, based on stipulation of counsel, that in accordance with the statute as amended, which is effective in mid-December, 1995, and I refer to Ch. 725, § 5/104—21, the court in reviewing the record in this case finds that there is no *bona fide* doubt of the defendant's fitness that would require the court to conduct a fitness hearing in accordance with the amended statute. The court further finds in light of the testimony of both Doctor [*sic*]

Traugott and Damera that the defendant is fit and has been fit throughout all proceedings in this case."

On February 21, 1996, after ruling that the mitigating factors were insufficient to preclude the imposition of the death penalty, the court sentenced defendant to death on the murder conviction and imposed a consecutive term sentence of 30 years' imprisonment for the armed robbery conviction. Defendant filed a motion for reconsideration of his sentence, which the trial court denied on April 1, 1996. Defendant then filed this appeal.

As noted earlier, when this court initially addressed defendant's direct appeal, we remanded the cause to the circuit court so that defendant could be properly admonished, as required by Supreme Court Rule 605(b). On remand, defendant moved to withdraw his guilty plea. In support of this motion, defendant claimed: (1) it was mandatory that the trial court conduct a hearing to determine defendant's fitness prior to accepting defendant's guilty plea because defendant was taking psychotropic medication; (2) the factual basis proffered by the State was insufficient to support defendant's guilty plea as to armed robbery; and (3) defendant's plea of guilty as to armed robbery was not knowingly made.

On August 28, 1998, the circuit court conducted an evidentiary hearing on defendant's motion. At that hearing, defendant testified that he had been taking Sinequan continuously from July 1995 through August 1997. In August 1997, he asked to be taken off the medicine because it was causing him to hallucinate. According to defendant, when he took Sinequan in 1995, it caused his thinking processes to become "clogged up" and made it difficult for him to remember things. He also testified that when he entered his plea he was "depressed a lot, [and had] no will to live." He now wanted to withdraw his guilty plea, he said, because he was off medication and was thinking clearer.

Defendant also claimed his plea was not knowingly

and voluntarily made because he had been misinformed about the State's purpose in charging him with armed robbery. He testified that his trial attorney never told him that, under the laws in effect at the time, the commission of murder in conjunction with armed robbery made him eligible for the death penalty, but that the commission of murder in conjunction with aggravated vehicular hijacking did not. On this point, defendant's memory apparently was clear. He said he spoke with his attorney one or two days before the plea hearing and asked her about the change in the charges and for an explanation of the difference. Defendant recalled that his attorney told him "it really don't make a difference, it's just that aggravated carjacking wasn't in effect and I took it as she meant it wasn't a charge."

Defendant's trial counsel, Amy Davis, was then called as a witness. She testified that she told defendant that the State was charging him with armed robbery because it was one of the predicate offenses which made him death-eligible. Although Davis did not have a specific recollection of her conversation with defendant, she believed that she explained everything to him. She said she had anticipated that the State would be charging defendant with armed robbery due to the "problem" with the aggravated hijacking charge and had spoken to defendant about that situation even before the charges were amended.

On the subject of defendant's fitness, Davis conceded that defendant had insisted on pleading guilty, against her advice. Nevertheless, Davis testified she always believed defendant was mentally fit and understood what he was doing. When asked about her failure to request a fitness hearing, Davis responded that a fitness hearing was held. Although it was not a "conventional" fitness hearing, she said, two doctors testified and attested to defendant's fitness. This, she believed, "comported with the statute."

Finally, defendant called Dr. Lee, a licensed psychiatrist and the medical director of psychiatry at Silver Cross Hospital. Dr. Lee testified that he was on the speaker's board at Eli Lilly and Bristol-Meyers and he was part of the national lecturing board for other pharmaceutical companies. In this capacity, he educated physicians regarding new medications developed to treat depression, psychosis, and anxiety.

Dr. Lee never examined defendant or reviewed his medical records. Instead, Dr. Lee testified about what "potentially could be the affects [sic] of doxepin on an individual such as [defendant]." Dr. Lee was made aware that defendant had a self-inflicted gunshot wound to the head. Based on that fact, he assumed defendant had been suffering from brain trauma. Dr. Lee then testified that, based on his understanding of the clinical effects of Sinequan (doxepin), the doxepin, "especially in a person with brain trauma, could impair the person's higher cognitive function to a degree that would make it difficult to be legally fit to be able to assist in their defense."

Defense counsel also resubmitted for the court's consideration the written reports of two mitigation witnesses, Casey Kruse Goldberg and Dr. Damera.

The circuit court denied defendant's motion to withdraw his guilty plea in an order dated October 9, 1998, and defendant filed a motion for reconsideration. In this motion, defendant argued that his guilty plea had been the product of depression and was not voluntarily made. Defendant also claimed his trial counsel had been ineffective and had assumed the role of prosecutor on the subject of his fitness to plead guilty. The motion to reconsider was denied in an order dated February 17, 1999.

Because we retained jurisdiction, the cause was returned to this court for further review. The issues before us now are: (1) whether defendant should be

permitted to withdraw his guilty plea (a) because defendant did not receive a fitness hearing, (b) because defendant was deprived of effective assistance of counsel on the issue of his fitness because counsel took on the burden of establishing defendant's fitness, and (c) because defendant's decision to plead guilty was not voluntary, having been the product of his depression and the medication he was taking; (2) whether defendant should be found ineligible for the death penalty because the State presented an inadequate factual basis to support defendant's guilty plea as to armed robbery; (3) whether defendant's guilty plea violated due process because (a) his plea of guilty to armed robbery was not knowingly made or based on an accurate understanding of the facts or the law, and (b) he received ineffective assistance of counsel with regard to his decision to plead guilty to armed robbery; and, finally, (4) whether the Illinois death penalty statute is unconstitutional.[2]

## II. ANALYSIS

### Fitness to Plead and Be Sentenced

Defendant advances three arguments related to his fitness in support of his contention that the trial court erred when it denied his motion to withdraw his guilty plea. First, defendant contends he must be allowed to withdraw his guilty plea because he did not receive a fitness hearing before he entered his plea and because the hearing held during the course of his sentencing did not strictly conform with the requirements of section 104—10 of the Code of Criminal Procedure of 1963 (the

---

[2]Based on our decision in *People v. Fitzgibbon*, 184 Ill. 2d 320 (1998), defendant abandoned the argument, raised in his initial appeal, that the cause must be remanded because his attorney failed to provide a certificate indicating that she had reviewed a transcript of the entire sentencing hearing prior to filing the motion for reconsideration.

Code) (725 ILCS 5/104—10 *et seq.* (West 1998)). He claims entitlement to a fitness hearing based on his assertion that the trial court, on remand, "implicitly recogniz[ed] that [defendant] raised a *bona fide* doubt of his fitness at the time he pled guilty." We find no merit to defendant's claim that a *bona fide* doubt of his fitness ever existed. Consequently, defendant was not entitled to a fitness hearing.

Every defendant is presumed to be fit to stand trial, or to plead, and be sentenced. 725 ILCS 5/104—10 (West 1998). If circumstances suggest that a defendant, because of physical or mental disability, is unable to understand the nature and purpose of the proceedings against him or to assist in his defense, the issue of defendant's fitness may be raised by the defense, the State, or the court. 725 ILCS 5/104—10, 104—11(a) (West 1998). If information made known to the court causes the court to believe that a *bona fide* doubt of the defendant's fitness exists, the court must suspend proceedings until the defendant can be examined and his fitness determined. 725 ILCS 5/104—11 (West 1998). Once a *bona fide* doubt of the defendant's fitness has been demonstrated, the State has the burden of proving, by a preponderance of the evidence, that defendant is fit before the proceedings may continue. 725 ILCS 5/104—11(c) (West 1998).

This statutory scheme, which requires a fitness hearing only when a *bona fide* doubt of defendant's fitness is demonstrated, has been held constitutionally adequate to protect a defendant's right, guaranteed by the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), to be prosecuted only when fit to stand trial. *Drope v. Missouri*, 420 U.S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975); *People v. Mitchell*, 189 Ill. 2d 312 (2000).

At the time defendant entered his plea of guilty, our legislature afforded a defendant taking psychotropic

medication a statutory right to a fitness hearing. See 725 ILCS 5/104—21(a) (West 1994). Defendant never requested a fitness hearing pursuant to this statute because the psychotropic nature of the medication he was taking was not known at the time he entered his plea.

The failure to receive a fitness hearing pursuant to section 104—21(a), defendant concedes, does not require automatic reversal.[3] In recognition of *People v. Mitchell*, defendant also acknowledges that the use of psychotropic medication is not equivalent to a *bona fide* doubt of his fitness. See *People v. Mitchell*, 189 Ill. 2d 312 (2000). He claims, however, that, in this case, his use of psychotropic medication, when considered in conjunction with evidence of his suicide attempt and depression, and the additional evidence presented at the hearing on his motion to withdraw his guilty plea, established that at the time he entered his plea there was a *bona fide* doubt of his fitness which required a fitness hearing. Defendant also claims the presentation of evidence in the course of his sentencing proceedings was not a sufficient substitute for a fitness hearing in strict compliance with article 104 of the Code.

In essence, defendant asks us to review the trial court's ruling on his fitness. A circuit court's ruling on the issue of fitness will not be reversed unless it is against the manifest weight of the evidence. *People v. Haynes*, 174 Ill. 2d 204, 226 (1996); *People v. Mahaffey*, 166 Ill. 2d 1, 18 (1995). Our review of the record convinces us that defendant has not met this burden. The evidence presented to the trial court established that no *bona fide* doubt of defendant's fitness existed, with or without medication.

---

[3]On remand, defendant claimed automatic entitlement to withdraw his plea, based on our earlier decisions in *People v. Brandon*, 162 Ill. 2d 450 (1994); *People v. Gevas*, 166 Ill. 2d 461 (1995); *People v. Birdsall*, 172 Ill. 2d 464 (1996). In light of subsequent case law, he has abandoned this argument.

The record shows that sometime in late December 1995 or early January 1996 the psychotropic nature of the medicine was discovered and defendant's fitness was placed in issue. At about the same time, section 104— 21(a) was amended (see Pub. Act 89—428, § 605, eff. December 13, 1995 (amending 725 ILCS 5/104—21(a)) to state "no hearing is required unless the court finds there is a bona fide doubt of the defendant's fitness."[4]

Based on the unsettled nature of the law, neither the court nor counsel was certain of the proper procedure to follow. Nevertheless, an inquiry was made into defendant's legal competency while receiving psychotropic medication. Documentary and testamentary evidence was introduced during the course of defendant's sentencing hearing, which provided the court with information concerning defendant's ability to comprehend the nature and purpose of the proceedings against him and his ability to assist in his defense, as well as the impact, if any, that psychotropic medication had on defendant's fitness. Based on the evidence presented, the trial court explicitly ruled there was no *bona fide* doubt of defendant's fitness and that defendant had been fit at the time he entered his plea and throughout the sentencing proceedings. Defendant's ingestion of Sinequan, the trial court held,

[4]This amendment was struck down by this court in *Johnson v. Edgar*, 176 Ill. 2d 499 (1997), because it was included in a bill which violated the single subject requirement of the Illinois Constitution. Section 104—21(a) was amended again in 1996 to state: "[a] defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications." Pub. Act 89—689, § 90, eff. December 31, 1996 (amending 725 ILCS 5/104—21(a)). We previously held this amendment could not be given retroactive application in a case involving a direct appeal. See *People v. Kinkead*, 182 Ill. 2d 316 (1998); *People v. Cortes*, 181 Ill. 2d 249 (1998). Consequently, neither of the amended provisions applies in the present case.

could not have impaired defendant's fitness to plead or be sentenced.

On remand, the trial court reviewed its earlier proceedings and found that the post-plea inquiry into the matter of defendant's fitness, which was undertaken in the course of defendant's sentencing, had been sufficient to establish defendant's fitness with medication, in accord with our *Burgess* line of cases. See *People v. Burgess*, 176 Ill. 2d 289 (1997); *People v. Neal*, 179 Ill. 2d 541 (1997); *People v. Kinkead*, 182 Ill. 2d 316 (1998). The trial court was unpersuaded by the additional evidence presented at the remand hearing and declined the invitation to depart from its earlier ruling that defendant had been fit.

Contrary to defendant's assertions, the trial court's rulings are not against the manifest weight of the evidence. The evidence presented during the sentencing proceedings showed that defendant began receiving medication for his depression on July 25, 1995. The medication, along with the introduction of books on tape and other diversions, relieved some of the boredom defendant was feeling due to his blindness and improved defendant's mental health. Defendant was not considered a suicide risk at the detention facility. He attended Bible study sessions, wrote rap songs, and enjoyed witnessing his faith to fellow inmates. Furthermore, the medication he was taking actually appeared to improve defendant's clarity of thought. Testing showed that defendant's recall and memory were intact while taking medication. His attorney repeatedly acknowledged defendant's ability to understand, as well as his cooperation with his defense.

Admittedly, defendant did not receive a fitness hearing in strict compliance with article 104 of the Code. However, the need for a fitness hearing is triggered by evidence which creates a *bona fide* doubt of a defendant's fitness. In the case at bar, the issue of defendant's fitness

never was raised until it was learned that he was taking psychotropic medication. Once this became known, the court ascertained that defendant's use of this medication had no effect on his ability to plead or be sentenced. The evidence clearly supports that finding. The procedures followed by the trial court in this case were adequate to protect defendant's due process right to be tried only when fit. There is no basis shown for granting defendant relief from his guilty plea.

We further determine that the additional evidence presented on remand was insufficient to overcome the presumption of fitness which had already been established. Defendant's testimony that his memory was "clogged" while on medication was belied by the copious evidence presented during his sentencing hearing which indicated that defendant's ability to recall was unaffected by the relatively small dosage of Sinequan he was taking. Also, the testimony of Dr. Lee, who never examined defendant or reviewed his medical records, does little to negate the clear and convincing testimony of Drs. Damera and Traugott, that defendant's ability to understand the proceedings and assist in his defense was unaffected by his ingestion of the Sinequan.

In a related argument, defendant contends his counsel was ineffective because she did not insist that the trial court hold a fitness hearing and, instead, facilitated the court's finding of fitness by presenting the testimony of two psychiatrists who attested to defendant's fitness.

To prevail on an ineffective-assistance claim, a defendant must show both deficient performance by his attorney and prejudice resulting from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 524-25 (1984). In the case at bar, there are no grounds for finding defendant received ineffective assistance of counsel.

The argument defendant presents here is similar to one advanced in *People v. Burton*, 184 Ill. 2d 1 (1998). In *Burton*, defendant claimed he received ineffective assistance of counsel because his defense attorney stipulated to the testimony of two psychiatrists at a fitness hearing before the defendant entered his plea. We found trial counsel's performance was not *per se* deficient and that defendant had not shown any prejudice stemming from his counsel's conduct. *Burton*, 184 Ill. 2d at 17.

Here, as in *Burton*, defendant does not argue that he was prejudiced by his attorney's conduct, nor is he able to point to any information or argument that might have been offered to support a finding of unfitness. Without a showing of prejudice, the claim of ineffectiveness must fail.

In another related claim, defendant argues that he should be allowed to withdraw his guilty plea because his plea was not voluntary. He claims the decision to plead guilty was a product of his depression and the medication he was taking.

Defendant cites one case in support of this claim, *People v. Lego*, 168 Ill. 2d 561 (1995), which is distinguishable. In *Lego*, defendant waived his right to counsel and represented himself at trial. It became apparent at trial that defendant was ill-equipped to represent himself and it was later learned that two psychiatrists diagnosed defendant as suffering from a mixed organic disorder which included organic affective syndrome, organic brain syndrome, dementia and personality disorder. Defendant's mental deficiencies caused him to have a lack of judgment, inability to comprehend legal principles, and failure of memory. In light of defendant's deficiencies, it was determined that his waiver of representation could not have been knowingly or intelligently made. *Lego*, 168 Ill. 2d at 576-77.

Conversely, in the present case, all of the psychiatric

evidence indicated that defendant, though he suffered from depression, was able to comprehend the consequences of his decision to plead guilty. Furthermore, additional evidence showed that defendant made a conscious choice to plead guilty, knowing that he would be eligible for the death penalty. Defendant told Dr. House he preferred the death penalty because he feared that, if he remained in jail, he would be victimized due to his blindness.

The fact that defendant would no longer choose to plead guilty does not compel us to find his earlier decision to plead guilty was not voluntarily made.

### Eligibility for the Death Penalty

Defendant next contends that he should not have been found eligible for the death penalty. Although defendant pleaded guilty to murder and armed robbery, which, he admits, rendered him eligible for the death penalty, he now claims the State "manufactured" the armed robbery charge "in order to subject [him] to the death penalty," when "the only charge supportable under the facts" was aggravated vehicular hijacking, an offense which would not have made him death-eligible. He contends the trial court erred when it accepted the State's proffered factual basis in support of his plea because it was "legally and factually inadequate."

To better understand defendant's argument on this issue, some background is useful. On June 19, 1995, when the events giving rise to defendant's conviction occurred, Illinois statutes provided that a person committed the offense of armed robbery when "he or she violates Section 18—1 [of the Criminal Code of 1961] while he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon." Section 18—1 of the Code defined the offense of robbery and provided that "[a] person commits robbery when he or she takes property, *except a motor vehicle covered by Section 18—3 or*

*18—4*, from the person or presence of another by the use of force or by threatening the imminent use of force." (Emphasis added.) 720 ILCS 5/18—1 (West 1996).

The robbery statute was amended in August 1993 to include the phrase "except a motor vehicle covered by Section 18—3 or 18—4." See Pub. Act 88—351, § 5, eff. August 13, 1993. At the same time, the legislature enacted laws creating the offenses of vehicular hijacking (720 ILCS 5/18—3 (West 1994)) and aggravated vehicular hijacking (720 ILCS 5/18—4 (West 1994)). See Pub. Act 88—351, § 5, eff. August 13, 1993. As a result of this legislation, beginning in August 1993, a person who took a motor vehicle from the person or immediate presence of another, by use of force and while armed with a weapon, committed the offense of aggravated vehicular hijacking, not armed robbery.

At the same time, section 9—1(b)(6) of the Criminal Code of 1961 provided that a person who committed the offense of first degree murder in the course of one of several specified felonies would be eligible for the death penalty. While armed robbery was one of the listed felonies, aggravated vehicular hijacking was not. Aggravated vehicular hijacking was added to the list of predicate offenses in July 1995. See Pub. Act 88—678, § 10, eff. July 1, 1995. Consequently, during a nearly two-year period, between August 1993 and July 1995, first degree murder committed in the course of an armed robbery of any property other than a motor vehicle supported the imposition of the death penalty.

Defendant was indicted on July 13, 1995, and was charged with the commission of first degree murder and aggravated vehicular hijacking. At the same time, the State declared its intent to seek the death penalty against defendant—this intention was announced to the public in a July 14, 1995, press release. At some point, the State became aware that, due to the anomalous statutory

scheme which existed at the time defendant committed the offenses with which he was charged, aggravated vehicular hijacking was not a predicate offense for the imposition of the death penalty. The State then amended the charges against defendant, adding a charge of armed robbery and alleging that defendant, in addition to taking Gilmore's automobile, took the contents of the automobile.

As noted earlier, defendant pleaded guilty to the charges of first degree murder and armed robbery. He did not plead guilty to aggravated vehicular hijacking. At the plea hearing, the State presented a factual basis in which it was shown that defendant shot Gilmore, pulled her from her automobile, and then drove away with her car and personal belongings, including clothing, plants, and audio cassette tapes.

Initially, we address defendant's claim that the trial court erred by accepting the factual basis proffered by the State. The requirement of a factual basis for a guilty plea is embodied in Supreme Court Rule 402(c), which states: "The court shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea." 134 Ill. 2d R. 402(c).

In *People v. Barker*, 83 Ill. 2d 319 (1980), this court discussed the factual basis requirement and concluded:

"[T]he quantum of proof necessary to establish a factual basis for the plea is less than that necessary to sustain a conviction after a full trial. [Citations.] All that is required to appear on the record is a basis from which the judge could reasonably reach the conclusion that the defendant actually committed the acts with the intent (if any) required to constitute the offense to which the defendant is pleading guilty. [Citations.] In evaluating the sufficiency of the factual basis to support a plea of guilty, a trial judge is in much the same position and would apply similar standards as those used in determining the sufficiency of the State's evidence at trial to withstand a motion for a directed verdict of not guilty." *Barker*, 83 Ill. 2d at 327-28.

We note, too, that armed robbery is a general intent crime. *People v. Banks*, 75 Ill. 2d 383, 391 (1979). Consequently, armed robbery is proven if "the prohibited result may reasonably be expected to follow from the offender's voluntary act even without any specific intent by the offender." *People v. DeBusk*, 231 Ill. App. 3d 229, 241 (1992).

In the case at bar, the factual basis proffered by the State in support of defendant's plea of guilty to armed robbery consisted of evidence that defendant took Gilmore's belongings which were contained in her car. We conclude that the State set forth sufficient facts from which the court could have found that the offense of armed robbery took place.

Defendant argues, however, that the State "circumvented the intent of the legislature" by charging him with the armed robbery of the contents of Gilmore's car. He claims the State "did an end-run around the language" of the statutes and took "what is essentially a lesser included offense of aggravated vehicular hijacking and imbued it with far graver consequences than the principle offense." The taking of Gilmore's belongings, he says, should have been subsumed by the taking of the automobile. In other words, defendant contends aggravated vehicular hijacking was the more appropriate charge under the circumstances.

We interpret this portion of defendant's argument as alleging that the State acted improperly by electing to charge defendant with armed robbery because of the sentencing option it would provide. This claim, however, must be rejected.

It has long been recognized by this court that the State's Attorney is endowed with the exclusive discretion to decide which of several charges shall be brought, or whether to prosecute at all. *In re J.J.*, 142 Ill. 2d 1, 6-7 (1991); *People ex rel. Daley v. Moran*, 94 Ill. 2d 41, 45-46

(1983). A prosecutor's discretion extends to decisions about whether or not the death penalty should be sought. *People v. Heard*, 187 Ill. 2d 36 (1999); *People v. Williams*, 147 Ill. 2d 173, 265 (1991). It is not a constitutional violation for a prosecutor to consider the respective penalties when choosing which of several applicable charges to pursue. *United States v. Batchelder*, 442 U.S. 114, 123-24, 60 L. Ed. 2d 755, 764, 99 S. Ct. 2198, 2204 (1979) ("when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants"). When conduct violates more than one statute, each of which requires different proof or provides different defenses, a defendant is not denied equal protection of the laws if he is prosecuted under the statute which provides the more severe penalty. *People v. Barlow*, 58 Ill. 2d 41 (1974). "[A] defendant has no constitutional right to compel his prosecution for the lesser, rather than the greater, offense." *People v. Bogan*, 185 Ill. App. 3d 129, 134 (1989).

In the case at bar, it was within the State's discretion to prosecute the armed robbery charge to the exclusion of the allegedly greater aggravated vehicular hijacking charge, irrespective of which charge may be more appropriate under the facts of this case. There is no basis for finding that defendant was ineligible for the death penalty.

Denial of Motion to Withdraw Guilty Plea

Defendant contends he should be allowed to withdraw his guilty plea because he entered his plea under a misapprehension of the law. Specifically, defendant contends he did not understand the significance of the State's election to charge him with armed robbery and "believed the consequences of pleading guilty to aggravated vehicular hijacking and armed robbery essentially were the same." This misapprehension of the law, he says, requires a find-

ing that his guilty plea was not knowingly and voluntarily made and, consequently, entered in violation of his due process rights. He further contends he was denied the effective assistance of counsel based on his trial attorney's alleged failure to explain to him the significance of the State's decision to charge him with armed robbery.

A defendant does not have an automatic right to withdraw a plea of guilty. Rather, he must show "a manifest injustice under the facts involved" to obtain leave to withdraw his plea. *People v. Pullen*, 192 Ill. 2d 36, 39 (2000). It is within the sound discretion of the trial court to decide whether a plea of guilty may be withdrawn under Rule 604(d) (145 Ill. 2d R. 604(d)), and that decision will not be disturbed unless it appears that the guilty plea was entered through a misapprehension of the facts or of the law, or that there is doubt of the guilt of the accused and the ends of justice would better be served by submitting the case to a trial. *People v. Hillenbrand*, 121 Ill. 2d 537, 545 (1988); *People v. Hale*, 82 Ill. 2d 172 (1980). The trial court's decision is reviewed only for abuse of discretion. *Pullen*, 192 Ill. 2d at 40; *People v. Gosier*, 145 Ill. 2d 127, 143 (1991); *People v. Kidd*, 129 Ill. 2d 432, 447 (1989).

In the case at bar, defendant's claim of misapprehension was presented to the trial court on remand, when he sought leave to withdraw his guilty plea. As noted earlier, while defendant testified at the evidentiary hearing that he was not made aware that aggravated vehicular hijacking was not a predicate offense which would support the imposition of the death penalty, defendant's trial attorney testified to the contrary. The trial court resolved the conflict against defendant and found no manifest injustice which would require granting defendant the relief he sought. We see no reason to disturb the trial court's determination.

Defendant's misapprehension regarding the ag-

gravated vehicular hijacking charge, if indeed it existed, does not require withdrawal of his guilty plea. Whether or not defendant understood that aggravated vehicular hijacking was not a predicate offense is not relevant to the issue of the voluntariness of his plea. In *People v. Walker*, 91 Ill. 2d 502, 512 (1982), this court noted:

"[S]ection 9—1(b) of our death penalty statute requires only that the State prove beyond a reasonable doubt, *inter alia*, that the murder was committed in the course of one of the felonies enumerated in section 9—1(b)(6)(c). The phrase 'in the course of' does not require that the defendant complete one of the enumerated felonies or that he be charged and convicted of any offense other than murder to be eligible for the death penalty."

Furthermore, it is undisputed that defendant was fully admonished by the trial court in accord with Supreme Court Rule 402(a) before he tendered his plea. The record shows that defendant was advised that a plea of guilty to murder and armed robbery exposed him to the death penalty. Defendant acknowledged on the record that he understood the implications of his guilty plea. Moreover, evidence subsequently adduced at the sentencing hearing supports the position that defendant understood he was eligible for the death penalty based on the plea he entered. There is no evidence that defendant's plea was not knowingly and voluntarily made. As a result, we find the trial court did not abuse its discretion by denying defendant's motion to withdraw his guilty plea.

Constitutionality of the Death Penalty Statute

Defendant's final issue is a challenge to the constitutionality of the death penalty statute. This court has already considered and rejected the arguments raised by the defendant here: (1) that the statute places on the defendant the burden of proving that the mitigation evidence is sufficient to preclude the imposition of the death penalty (see, *e.g.*, *People v. Emerson*, 189 Ill. 2d 436, 514 (2000); *People v. Kliner*, 185 Ill. 2d 81, 177-78 (1998);

*People v. Johnson*, 182 Ill. 2d 96, 112 (1998); *People v. Simpson*, 172 Ill. 2d 117, 152 (1996)); (2) that the statute is unconstitutionally vague because it allows the sentencer, when hearing evidence in aggravation, to consider "any other reason" (see, *e.g.*, *People v. Buss*, 187 Ill. 2d 144, 248 (1999); *Johnson*, 182 Ill. 2d at 112-13; *People v. Hope*, 168 Ill. 2d 1, 48 (1995)); and (3) that the statute fails to minimize the risk of arbitrarily imposed death sentences (see, *e.g.*, *Emerson*, 189 Ill. 2d at 514; *Johnson*, 182 Ill. 2d at 113; *People v. Williams*, 181 Ill. 2d 297, 333 (1998); *People v. Brown*, 172 Ill. 2d 1, 62-63 (1996)).

Defendant's repetition of previously rejected arguments fails to persuade us to abandon our determination of constitutionality. We reject defendant's constitutional challenge to the Illinois death penalty statute.

### III. CONCLUSION

For the foregoing reasons, the decision of the circuit court is affirmed. The clerk of this court is directed to enter an order setting Tuesday, September 11, 2001, as the date on which the sentence of death, entered by the circuit court of McLean County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree with the majority that Jamison's convictions should be affirmed. In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death

penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Jamison's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1994).