NOTICE

Decision filed 02/24/23. The
text of this decision may be
changed or corrected prior to
the filing of a Petition for
Rehearing or the disposition of
the same.

2023 IL App (5th) 210395-U

NO. 5-21-0395

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Washington County. |
| | ) | |
| v. | ) | No. 19-CF-40 |
| | ) | |
| JARED M. QUEEN, | ) | Honorable |
| | ) | Eugene E. Gross, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where sufficient evidence to prove defendant's guilt beyond a reasonable doubt
was apparent by the record and no claim of reversible error had merit, defendant's
attorney on appeal is granted leave to withdraw as counsel, and the judgment of
conviction is affirmed.

¶ 2    Defendant, Jared M. Queen, appeals his judgment of conviction following a jury trial which

found him guilty of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(4) (West 2018)),

unlawful possession of weapons by a felon (*id.* § 24-1.1(a)), and aggravated fleeing or attempting

to elude a peace officer (625 ILCS 5/11-204.1(a)(4) (West 2018)). His appointed attorney on

appeal, the Office of the State Appellate Defender (OSAD), concluded this appeal lacks merit and

filed a motion to withdraw as counsel and a brief in support thereof. See *Anders v. California*, 386

U.S. 738 (1967). We granted defendant ample opportunity to file a written response to OSAD's

1

pleadings, explaining why this appeal had merit, but no response was filed. Having examined OSAD's *Anders* motion and brief, along with the entire record on appeal, this court agrees this appeal has no merit. Accordingly, we grant OSAD leave to withdraw as counsel on appeal and affirm the judgment of the circuit court of Washington County.

¶ 3                                             BACKGROUND

¶ 4                                                Pretrial

¶ 5      On July 2, 2019, defendant, and his passenger, Maria Moore, were arrested following a 37-minute, 52-mile vehicle chase that started in Centralia, Illinois, and ended in Coulterville, Illinois. During that time, defendant and his passenger repeatedly fired a shotgun toward the pursuing police vehicles, most notably toward the lead police vehicle driven by Steve Prather, the chief of police in Wamac, Illinois. The following day, the State filed an information charging defendant with 12 counts that included attempted first degree murder, five counts of aggravated discharge of a firearm, two counts of unlawful possession of weapons by a felon, and aggravated fleeing or attempting to elude a peace officer.[1]

¶ 6      On August 13, 2021, the State filed an amended information charging defendant with 12 counts. In counts I through VII, defendant was charged as the principal offender with, *inter alia*, attempted first degree murder, unlawful possession of weapons by a felon, and four counts of aggravated discharge of a firearm. In counts VIII through XII, defendant was charged under an accountability theory with attempted first degree murder and four counts of aggravated discharge of a firearm. On August 17, 2021, defendant moved to strike the amended information contending

---

[1]None of these charges relied on an accountability theory. The law of accountability allows a person to be convicted for crimes committed by another person, even if the person has not been charged or convicted, or was convicted of a different offense, or was even acquitted. See 720 ILCS 5/5-3 (West 2020).

2

the amended information subjected him to unfair surprise by charging him with five additional counts based on accountability, which involved "a completely different theory" of guilt.

¶ 7    Thereafter, the State filed a second amended information charging defendant with 15 counts. In the first nine counts, defendant was charged as the principal offender with, *inter alia*, attempted first degree murder, unlawful possession of weapons by a felon, aggravated fleeing or attempting to elude a peace officer, and five counts of aggravated discharge of a firearm. In the last six counts, defendant was charged under an accountability theory with attempted first degree murder and five counts of aggravated discharge of a firearm.

¶ 8    The hearing on defendant's motion to strike was held on August 17, 2021, at which time defense counsel clarified that the motion to strike focused on the counts alleging or relying upon accountability and included those in both the first- and second-amended information. The State argued that the evidence disclosed during discovery was sufficient to support a theory of accountability. Defense counsel said that he could later assert his motion based upon the State's case in chief. The trial court urged the State to file an information charging defendant "or one for whom he is legally responsible" with the alleged crimes suggesting this approach would "cut the number of counts down" and make the jury instructions less voluminous and less confusing. The State indicated "no problem with amending the information to do that." Defense counsel said that he "wouldn't be surprised" if the State filed a third amended information along the lines the judge suggested and stated that "[i]f he files it I won't have to file another motion or bring it back up." The trial court reserved ruling on the defense's motion to strike and "specifically grant[ed] the State leave to file a third amended information if they so choose to simplify the counts by including the accountability language and the actual count."

3

¶ 9	On August 20, 2021, the State filed its third amended information. It charged the defendant with four felonies—attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(2) (West 2018)) (count I), aggravated discharge of a firearm (*id.* § 24-1.2(a)(4)) (count II), unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) (count III), and aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(4) (West 2018)) (count IV). The first and second of these charges alleged defendant "or one for whom he is responsible' committed the offenses to incorporate an accountability theory. The third and fourth charges mentioned only defendant.

¶ 10	On August 20, 2021, defense counsel directed the court's attention to the third amended information. Defense counsel stated that "[t]his was anticipated" after the last court appearance, and he had reviewed the third amended information with the defendant. Defense counsel waived formal reading of the charges and entered a plea of not guilty. Defendant confirmed he had read and understood the latest information and stated the trial court did not need to read it aloud.

¶ 11	Trial

¶ 12	On August 23, 2021, a jury trial ensued. The State's first witness was Farin Kays, a cosmetologist in Centralia, who testified that on July 2, 2019, she was driving on South Hickory Street in Centralia when she noticed a four-door gold sedan parked at an abandoned, dilapidated warehouse. A man was leaning over the driver's seat, facing the back seat, and appeared to be striking someone or something with such force that it caused the car to rock. Ms. Kays phoned the Centralia police to report what she saw. As she passed the sedan, the man "peeled out."

¶ 13	Curt Griffith, a Centralia police officer, also provided testimony indicating that he was on duty and on patrol on July 2, 2019. He wore a police uniform and drove a marked squad car with decals and overhead red-and-blue lights. At approximately 10:45 a.m., he heard a dispatch concerning a gold-colored car. He planned to go south on Hickory Street to the location mentioned

4

in the dispatch, but then he saw what he thought was the gold car. He activated his squad car's siren and overhead lights. He saw the gold car disobey two stop signs, but then he lost sight of it. Over his radio, he heard that the gold car was heading west on 17th Street. He then joined a procession of police cars following the gold car. He was "the last vehicle in line in this pursuit." When the pursuit ended in Coulterville, Officer Griffith saw the gold car, and watched police officers handcuff two people, including defendant. After Officer Griffith laid the foundation for the video recorded by his squad car's dashcam, the video was shown to the jury.

¶ 14     Steve Prather, the chief of police in Wamac, Illinois, testified that on July 2, 2019, he was in his Ford Explorer, near the Wamac post office. The Explorer had no decals but did have "all the lights and sirens and everything." At approximately 10:45 a.m., he heard radio traffic about a gold car, drove to the corner of Locust and 17th Streets in Wamac, and waited. The suspect vehicle turned in front of him and proceeded westbound. Chief Prather saw two occupants, "a short-haired white male" in the driver's seat and "a middle-weight blonde" woman in the passenger seat. Chief Prather pursued them, immediately turning his own vehicle so that he was traveling directly behind them, and promptly activated his lights and siren. The lights included "a long bar" of red and blue lights below the sun visors, and red and blue lights in the grill and bumpers. Chief Prather followed the car as it moved westbound on 17th Street for about one block, then as it turned south onto Wabash Avenue, "at a very high rate of speed" failing to stop at a stop sign.

¶ 15     Chief Prather testified that once the cars were headed south on Route 51 the speeds "really increased." He stated his car was going "between 120 and 122" miles per hour. While he was not losing the suspect, Chief Prather "was not gaining on him either." He testified that the speed limit along that stretch of road was 65 miles per hour. Chief Prather stated the driver abruptly exited southbound on Route 51 at the Irvington exit, in Washington County. Traveling 45 or 50 miles per

5

hour, the suspect driver disregarded the stop sign at the end of that exit and headed west on Route 177 toward Irvington. The chase continued through Irvington's small downtown area at 90 to 100 miles per hour. Thereafter, the chase continued westbound on Route 177 toward Hoyleton. It was at this point that Chief Prather noticed the driver and passenger were moving around, and seemed to be reaching for something, in the car. The woman looked back toward Chief Prather and grabbed "a long gun" which the officer could easily see in the car. The woman handed the long gun to the driver as the cars drove toward Hoyleton.

¶ 16    Chief Prather testified that once the vehicles were past Hoyleton, the male driver held the gun, awkwardly, outside his window, using one hand. At that point in the chase, there were "probably four" squad cars behind Chief Prather's vehicle participating in the chase. The driver pointed the barrel of the gun directly at Chief Prather's car. Fearing the firearm was a rifle, Chief Prather slowed a bit, putting "a little more distance" between his car and the car he was chasing. Although he did not hear a shot, Chief Prather "believed" the driver fired two, and possibly three shots, at him. He "saw a puff of smoke [come] out of the barrel" and radioed that "shots had been fired." When he heard "the pellets hit the car," he knew the long gun was a shotgun. The driver pulled the gun back into the car and handed it to passenger. The cars continued westbound through New Minden. Once past New Minden, Chief Prather saw the driver put his head, shoulder, and arm out of the driver's window, holding the gun in more of a "shooting stance," with "the butt of the gun up against his arm." At the same time, the officer saw the woman "lean over" and attempt to steer the car, which was "all over the road." Pointing the gun at Chief Prather's vehicle, the driver fired "two or three" shots from a distance of "250 to 300 feet." After firing, the driver moved back inside the car and resumed driving.

6

¶ 17    After following the car for a few more miles, Chief Prather watched the woman in the car stand up through the sunroof and point and fire the shotgun two or three times, in his direction. He stated the woman had difficulty standing because the car she was in was traveling 100 to 110 miles per hour. The car turned south on Highway 4 and "[a]ll the way to Addieville she would stand up occasionally and fire some rounds." Chief Prather could not be specific on the number of times the woman fired, but he heard "the pellets" hit his car "numerous times." They drove through Addieville and proceeded toward Oakdale, driving at "high speeds," requiring other cars to take evasive measures to avoid being struck. Along this stretch of road, the officer stated the woman repeatedly "wave[d]" the gun out of the window and fired it. After the vehicles left Oakdale, the woman again stood up through the sunroof and "fired a round." At that time, Chief Prather's vehicle was approximately "150, 200 feet" from the car he was following. He responded by firing his service revolver, twice, out of his window, but neither shot hit anything. The cars continued southbound, then turned east onto Cemetery Road, which was a gravel road. Chief Prather saw the shotgun fly out the sunroof and land in a farm field. The car did not stop, and the officer continued his pursuit. Thereafter, the woman popped out of the sunroof and started throwing various items (water jugs, a cardboard box, etc.) at Chief Prather's car, but he managed to avoid hitting them.

¶ 18    Chief Prather testified that as they entered Coulterville and slowed to "between 45 and 60" miles per hour, his police vehicle was on the other car's "bumper." At that point, Chief Prather rammed the back of the car, causing it to spin "through a ditch and up into a yard." The car stopped. Chief Prather stopped his vehicle, got out, drew his service weapon, and approached the car. The officer identified defendant as the driver of the car. Defendant fought the officer a bit, but with the assistance of four other officers, defendant was quickly handcuffed. Thereafter, Chief Prather backtracked the route of the chase and found a shotgun in a farm field.

7

¶ 19    William Oelze testified that on July 2, 2019, he was driving a car from his home in Nashville, Illinois, to Fairview Heights, Illinois. His mother was his sole passenger. He was driving on Highway 27 when he saw, to his right, a champagne-colored vehicle coming from New Minden "being followed by several police cars." Mr. Oelze stopped at the intersection and began video-recording the procession of cars. He could see that a man was driving the sedan that was being pursued. The cars were not moving fast at that time, "maybe 30, 35 miles an hour." Once all of the cars had passed, Mr. Oelze heard gunshots. He saw the driver of the champagne-colored car leaning out of the vehicle, "backward," and appeared to have "a long gun," which he pointed and fired toward the pursuing police cars. Mr. Oelze's video was played for the jury. Mr. Oelze's mother, Mary Oelze, provided testimony consistent with that of her son.

¶ 20    Jamie James, a lieutenant in charge of investigations with the Centralia Police Department, testified that on July 2, 2019, he was a sergeant in charge of day shift patrol.  He was traveling in his marked squad car, eastbound on Route 161, when he heard a radio dispatch about someone beating something in the backseat of a gold-colored sedan. Lieutenant James soon joined the police pursuit of the gold vehicle, activating the red-and-blue oscillating lights of his squad car. He stated that Chief Prather of Wamac led the chase, where speeds sometimes exceeded 100 miles per hour. At times during the chase, the man who was driving was leaning out of the car, aiming a "long gun" at the pursuing officers, while the female passenger drove the car. Later, the female passenger popped halfway out of the sunroof and aimed a "long gun" at the pursuing officers. Lieutenant James could not hear any shots being fired. The remainder of Lieutenant James' testimony was consistent with Chief Prather's testimony. He identified defendant as the driver of the gold car and laid the foundation for a video of the chase, which was recorded by the dashcam in his squad car and played for the jury.

¶ 21    Officer Derek Williams of the Wamac Police Department, Chief Greg Dodson of the Centralia Police Department, and Deputy Adam Hall of the Washington County Sheriff's Department also testified regarding their participation in the chase. Their testimony was consistent with that provided by Officer Prather and the other officers engaged in the pursuit.

¶ 22    Additional testimony, regarding events following the chase and subsequent arrest of defendant, confirmed a 20-gauge bolt-action shotgun was found off of Oakdale Cemetery Road, approximately 16 feet south of the road, at the edge of a bean field. The barrel of the shotgun was bent. There were no shells in the magazine, and the magazine was chambered in the shotgun. The chamber contained no shells, spent or live, and no casings. The inside of a gold Jaguar sedan revealed 14 shotgun shells—10 "live" and 4 fired. They were 20-gauge 7.5 shot. West of Oakdale, along the chase route, a discharged 20-gauge shotgun shell was discovered. No testing was performed on the shotgun or on any of the shells. The hood of Chief Prather's vehicle revealed tiny scratches and paint chips.

¶ 23    The various videos played for the jury during the State's case in chief showed a high-speed police chase in pursuit of a gold Jaguar sedan. The chase wound through the country and small towns. On various roads, vehicles were parked on the side to allow the officers to pass. The chase lasted more than 35 minutes. The firing of a gun was not clearly seen in any of the videos.

¶ 24    The State rested. Defense counsel moved for a directed verdict of not guilty as to each of the four counts. The court granted the motion as to count I, attempted first degree murder, due to the State's failure to prove an intent to kill. The trial court denied the motion as to the other three counts.

¶ 25    The defense presented expert testimony evidence from Timothy Hicks of Professional Analysis and Consulting in Lisle, Illinois. Mr. Hicks was the principal engineer in charge of testing

9

anything related to mechanical engineering at that business. He testified that the firearm collected in this case was a bolt-action, 20-gauge Mossberg 185D-B, from the early 1950s. It had a magazine and was designed for shooting birds and small game. Hicks stated this type of firearm was rarely seen. Although Hicks did not test the firearm in evidence, he found and tested a 20-gauge Mossberg 185D, an essentially identical firearm from the late 1940s and 1950s.

¶ 26    Hicks explained that a bolt-action magazine required the shooter to manually recycle the bolt to put a new round in the chamber after the gun was fired. He stated the act always required both hands to manually cycle the bolt. The tests Hicks performed were designed to understand the capabilities of the gun from a normal shooting position, its accuracy, how quickly it could fire a certain number of rounds, and the distance at which the shell was lethal or could cause injury. Hicks found that an experienced shotgun shooter, standing outdoors on solid and flat ground, with low to moderate winds, required approximately two minutes to fire 10 rounds. From a distance of 40 feet, the blast from that gun was "going to do some damage."

¶ 27    Hicks cast doubt on Chief Prather's testimony that defendant seemed to fire the gun as he held it one-handed out the window, with the barrel pointed backward. According to Hicks, both he and his experienced assistant held the gun, which weighed 6.5 pounds, and neither of them felt it was safe to fire in that manner. Both considered it "unlikely *** the gun could have been fired that way without dropping it or losing it." Hicks later acknowledged the gun could be fired with one hand if it were shouldered first.

¶ 28    The parties stipulated that defendant was previously convicted of a felony in Marion County for possession of methamphetamine manufacturing material. The parties further stipulated the jury would be informed solely of the felony conviction with no other details provided.

10

¶ 29    Following closing arguments, the trial court provided jury instructions, which included an instruction on accountability. After 20 minutes of deliberation, the jury returned guilty verdicts on the three remaining counts, *i.e.*, aggravated discharge of a firearm, unlawful possession of weapons by a felon, and aggravated fleeing or attempting to elude a peace officer. Judgment was entered on the verdicts and the court ordered the preparation of a presentence investigation report (PSI).

¶ 30                                   Posttrial

¶ 31    The PSI revealed defendant was 40 years old when the current crime was committed and had a history of convictions going back 20 years that include nine prior felony convictions in Missouri and Illinois with eight of those convictions resulting in prison sentences. Defendant also had various misdemeanor convictions in Missouri and Arkansas. While incarcerated, defendant was diagnosed and treated for various mental illnesses, including mood disorder, drug dependency, anxiety, panic attacks, and depression.

¶ 32    On September 21, 2021, defendant's counsel filed a motion for new trial that claimed, *inter alia*, defendant was not proved guilty beyond a reasonable doubt, and the court erred in instructing the jury as to the State's theory of accountability. Following a hearing, the court denied the motion.

¶ 33    The sentencing hearing was held on November 16, 2021. The parties agreed the court correctly recited the possible sentences for the three convictions and agreed the sentences were required to run concurrently. Each party presented their sentencing recommendations. Defendant's statement in allocution included an apology and indicated he sent letters of apology to all of "the officers and witnesses" in the case. The court found that no factors in mitigation applied, but a few different factors in aggravation—including defendant's conduct's risking other people's safety, and his low potential for rehabilitation—applied. The court sentenced defendant to 40 years' imprisonment for aggravated discharge of a firearm, 10 years' imprisonment for unlawful

possession of weapons by a felon, and 6 years' imprisonment for aggravated fleeing or attempting to elude a peace officer. The sentences would run concurrently, and a three-year term of mandatory supervised release was to follow imprisonment.

¶ 34 Defendant moved for reconsideration of his sentences, claiming they were excessive and did not properly reflect the mitigation factors. Following a hearing, the trial court denied the motion. Defendant promptly filed a notice of appeal and OSAD was appointed as counsel.

¶ 35                                ANALYSIS

¶ 36 On appeal, OSAD's brief presents six potential issues on appeal, but ultimately determines the issues have no arguable merit. We agree.

¶ 37 The first potential issue is whether the circuit court erred by allowing the State to file a third amended information three days before the trial commenced. "The trial court's decision to allow an amendment to the charging instrument will not be disturbed unless the court abused its discretion." *People v. Alston*, 302 Ill. App. 3d 207, 211 (1999). "It has long been recognized by this court that the State's Attorney is endowed with the exclusive discretion to decide which of several charges shall be brought, or whether to prosecute at all." *People v. Jamison*, 197 Ill. 2d 135, 161 (2001). This discretion extends to amending the information. See *People v. Flores*, 250 Ill. App. 3d 399, 401 (1993). "[A]mendments changing the manner in which the defendant committed the offense are formal, not substantive" (*People v. Ross*, 395 Ill. App. 3d 660, 670 (2009)), and formal defects may be amended at any time, and should be amended, where "there is no resulting surprise or prejudice to the defendant or where the record clearly shows that he was otherwise aware of the actual charge against him" (*Flores*, 250 Ill. App. 3d at 401).

¶ 38 Here, the State's amendment of the information added an alternate theory of accountability. Such amendment is not even necessary because it well established that a defendant may be charged

as principal, although the proof reveals that defendant was only an accomplice. *People v. Ceja*, 204 Ill. 2d 332, 361 (2003) (citing *People v. Nicholls*, 42 Ill. 2d 91, 100 (1969)). "Courts permit this pleading practice because accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense." *Id.* Here, defendant's counsel further stated three times the amended information was expected and was not a surprise. Given these facts, no surprise or prejudice can be shown, and we agree the issue has no merit.

¶ 39    The second potential issue is whether the judgment of conviction should be reversed due to the trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 40    Rule 431(b) states:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects."
>
> Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

These four principles are commonly known as the *Zehr* principles pursuant to *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).

¶ 41    Following *Zehr*, its progeny, and the codification found at Rule 431(b), it is undisputed that failure to specifically inquire of the prospective jurors if they understood and accepted the four *Zehr* principle is error. *People v. Birge*, 2021 IL 125644, ¶ 36. Here, OSAD's contention that of the 12 jurors who ultimately decided the case, only 9 explicitly understood and accepted the

13

*Zehr* principles is supported by the record. Equally obvious is that three of the eventual jurors merely indicated that they "heard" and accepted the principles. As noted in *Birge*, the trial court is required to determine both understanding and acceptance of the principles. *Id*. Such error seen here is similar to that seen in *People v. Sebby*, 2017 IL 119445. In *Sebby*, "the trial court asked jurors whether they 'had any problems with' or 'believed in' those principles." *Id.* ¶ 49. The court found this was clear error. *Id*. Here, while we have confirmation that three accepted jurors "heard" and accepted the principles, we have no confirmation that they "understood" and accepted the principles. This is also "clear error." *Id*.

¶ 42    Defense counsel did not preserve this issue, but OSAD requests review under the plain error doctrine. This doctrine

> "allows a reviewing court to consider an unpreserved error (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Coats*, 2018 IL 121926, ¶ 9.

¶ 43    "A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that a violation produced a biased jury." *Sebby*, 2017 IL 119445, ¶ 52. Here, no such violation is found in the record. As such, we limit our inquiry to whether "the evidence [was] closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." (Internal quotation marks omitted.) *Coats*, 2018 IL 121926, ¶ 9.

14

¶ 44 "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Such review "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 45 Here, OSAD argues, and the record confirms, that several police officers testified that defendant was driving at speeds up to (or exceeding) 120 miles per hour and that his passenger popped out of the sunroof in order to fire a long gun, repeatedly, at the pursuing officers. Chief Prather testified that defendant leaned out of the driver's window and fired a long gun at him. The Oelzes testified that they saw part of the police chase and saw and heard the people in the sedan firing at the pursuing officers. Given the volume and weight of incriminating evidence, it cannot be said that the evidence against the defendant was closely balanced. As such, we agree the issue has no merit.

¶ 46 The third potential issue is whether defendant received a fair trial where the trial court failed to give the jury an instruction that the information was merely the formal method of bringing charges and not any evidence against defendant. During the jury instruction conference with counsel, the trial court stated it would give the jury an instruction that read as follows:

> "The charges against the defendant in this case are contained in a document called the information. This document is the formal method of charging the defendant and placing the defendant on trial. It is not any evidence against the defendant." Illinois Pattern Jury Instructions, Criminal, No. 2.02 (4th ed. 2000).

¶ 47 Despite the trial court's assurance, the instruction was not read to the jury. Defense counsel neither objected nor included this matter in a posttrial motion, resulting in the issue's forfeiture on

15

appeal. See *People v. Stevenson*, 198 Ill. App. 3d 376, 382 (1990). Despite the forfeiture, this court may consider substantial defects if the interests of justice require it. *People v. Herron*, 215 Ill. 2d 167, 175-76 (2005); Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). "[T]his exception will be invoked to correct grave errors or where the evidence is so close that fundamental fairness requires proper jury instructions." *Stevenson*, 198 Ill. App. 3d at 382.

¶ 48    No review of an omitted instruction will be necessary, however, if the jury received the omitted instruction during *voir dire*, and the evidence was not factually close. See *People v. Smith*, 165 Ill. App. 3d 603, 610-11 (1988). Here, the record confirms that during *voir dire* the trial court told each jury panel member one of the following: "[T]he charging document is no evidence at all"; "[A] piece of paper that is a charging instrument. That is not evidence"; and "The charges against [defendant] are no evidence whatsoever." As discussed *supra* and *infra*, the evidence in this case was not close. As such, we agree the issue has no merit.

¶ 49    The fourth potential issue addresses whether the trial court considered an inappropriate sentencing factor by twice referencing defendant's unknown motivation for fleeing the police. The record reveals the sentencing court, prior to actually imposing sentence, stated that "why [the defendant] fled in the first place is a big question." After imposing sentence, the court stated, "why the chase happened in the first place *** will always be a mystery." On review, we will uphold the sentence imposed by the circuit court absent an abuse of discretion. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15 (citing *People v. Perruquet*, 68 Ill. 2d 149, 153-54 (1977)).

¶ 50    In determining the appropriate sentence, a court may consider its impressions of the individual being sentenced, and all matters reflecting upon his personality, propensities, purposes, and tendencies. *People v. Traina*, 230 Ill. App. 3d 149, 156-57 (1992). As agreed by OSAD, the trial court's comments do not evidence the court's reliance on an inappropriate sentencing factor.

16

The trial court's reflection on defendant's high-speed chase with police for more than half an hour, while firing a shotgun at the pursuing officers, for no apparent reason, merely addresses the defendant's personality and propensities, which is not prohibited. Further, as noted by OSAD and confirmed by the record, the trial court also relied on proper sentencing factors, such as the defendant's risking other people's safety during the chase and his low potential for rehabilitation based on the prior felony and misdemeanor convictions. Such factors justify the sentences imposed here, which were all within the statutory ranges. We therefore agree this potential issue lacks merit.

¶ 51    The fifth potential issue is whether defense counsel provided ineffective assistance when he failed to seek a severance of the charge of unlawful possession of a weapon by a felon (UPWF) from the other charges defendant faced at trial. In order to prevail on a claim of ineffective assistance of trial counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) there was a reasonable probability that the result would have been different if the motion to sever had been filed. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). It has long been held that a decision to not seek a severance, even if "unwise in hindsight," is regarded as a matter of trial strategy. *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10. "Strategic decisions, such as pretrial motion practice, are insulated from *Strickland* challenges." *People v. Johnson*, 205 Ill. 2d 381, 407 (2002). Here, there is nothing in the record that would indicate that the lack of any motion to sever was anything other than trial strategy. Accordingly, we agree with OSAD that this issue has no merit.

¶ 52    The final potential issue in this appeal is whether defendant was proved guilty, beyond a reasonable doubt, of the three offenses for which the jury returned verdicts of guilty. On review, "the question is whether any rational trier of fact could have found the essential elements of the

17

crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the State." *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 53    The first offense for which defendant was found guilty was aggravated discharge of a firearm, in that he knowingly discharged a firearm in the direction of a vehicle he knew to be occupied by a peace officer. See 720 ILCS 5/24-1.2(a)(4) (West 2018). Chief Prather testified that his red-and-blue flashing lights were activated as he pursued the defendant's sedan 52 miles from Centralia, Illinois, to Coulterville, Illinois. He further testified that defendant, and his passenger, repeatedly fired a shotgun from the sedan toward his squad car. This evidence was sufficient to convict defendant of aggravated discharge of a firearm. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("[T]he testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant."). Moreover, Chief Prather's testimony was buttressed by the testimony of numerous other officers also in pursuit of defendant, as well as two civilians. The testimony was further supported by the damage seen on the hood of Chief Prather's police vehicle. No claim related to the sufficiency of evidence for this conviction has any merit.

¶ 54    To prove defendant guilty of unlawful possession of a weapon by a felon, the State must prove defendant knowingly possessed a firearm and that he had a prior felony conviction. See 720 ILCS 5/24-1.1(a) (West 2018). Defendant stipulated to his prior felony conviction, and Chief Prather's testimony, corroborated by that of other officers and citizens, was that defendant and his passenger both possessed the firearm during the chase. Again, any claim related to the sufficiency of evidence for this conviction has no merit.

¶ 55    To sustain a conviction for aggravated fleeing or attempting to elude a peace officer, the State must prove defendant fled or attempted to elude a peace officer by driving in excess of 21

18

miles per hour over the posted legal limit after being given a visual or audible signal to stop. See 625 ILCS 5/11-204.1(a)(4) (West 2018). Chief Prather testified that he turned on his flashing red-and-blue lights and his siren, and that defendant nevertheless continued to speed away from him, reaching speeds of 120 miles per hour, or more, on southbound Route 51, where the speed limit was 65 miles per hour. As with the other convictions, no argument regarding the sufficiency of evidence has any merit.

¶ 56                              CONCLUSION

¶ 57    None of the six potential issues raised by OSAD in its *Anders* brief have arguable merit. Accordingly, we grant OSAD's motion for leave to withdraw as counsel and affirm the judgment of conviction.

¶ 58    Motion granted; judgment affirmed.