2024 IL App (1st) 221101-U

Fourth Division
Filed May 2, 2024

No. 1-22-1101

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

<table>
<tr><td>THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>   Plaintiff-Appellee,<br><br>  v.<br><br>LACOLE MURRAY,<br><br>   Defendant-Appellant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Appeal from the<br>Circuit Court of Cook County<br><br>No. 14 DV 75903 01<br><br>The Honorable Laura Bertucci Smith,<br>Judge, presiding.</td></tr>
</table>

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held:*   We reverse the denial of the defendant's motion to vacate her plea where the motion was supported by the testimony of an expert in forensic clinical psychology.

¶ 2    LaCole Murray pleaded guilty to domestic battery (see 720 ILCS 5/12-3.2(a)(1) (West 2014)) and was sentenced to one year of probation. Murray appeals from the denial of her motion to withdraw that plea. We reverse, vacate her conviction, and remand for further proceedings.

¶ 3                                    BACKGROUND

¶ 4    Murray was charged with domestic battery to a minor. It was alleged that on or about August 19, 2014, Murray slapped her 16-year-old son A.M.'s head with an open hand, punched him in the face with a closed hand, and choked him with both hands. The incident was witnessed

by a case worker from the Department of Children and Family Services (DCFS). The case was eventually set for trial on March 17, 2015.

¶ 5                              Emergency Order of Protection

¶ 6     The week before trial, on March 12, the parties appeared in court and defense counsel indicated that she would not be ready for trial because, based on discovery that had been tendered at the last court date and some other information she had received, she needed to interview two witnesses. The court struck the trial date and set the case for a status hearing on April 1.

¶ 7     After the conclusion of the hearing, A.M., who had come to the courthouse with his parents, approached the prosecutor and asked to speak to him privately. After that conversation, and after Murray had left the courthouse to go to work, the case was recalled at the State's request, and it filed a petition for an emergency order of protection.

¶ 8     At the hearing that followed, A.M. testified that, in January 2015, Murray hit his arm twice using a belt after discovering a paper in his book bag saying that he had received an in-school suspension. A.M.'s father punched him in his chest and his arms and then grabbed him around the neck and choked him until he was dizzy. The day before Murray's court appearance (*i.e.* March 11), A.M.'s father accused him of lying about the charged incident, and Murray told A.M.'s father to tell A.M. not to lie and to tell the truth. Murray also told A.M. that, if he wanted to start a war, he could start a war. Before coming to court that morning, A.M.'s father grabbed him by the neck because he thought A.M. was taking too long to clean up a mess made by a dog. Also while at home that morning, Murray "was threatening to send [him] to a mental hospital and to have [him] locked up." She also repeated her remark about starting a war. Then, at the courthouse, Murray whispered to him, "[G]ame on, b***," as she walked past him to speak to her lawyer. After that remark, A.M. did not feel safe going home, so he spoke to the prosecutor privately. Murray's public defender was in the courtroom and was permitted to cross-examine A.M. He testified on cross-examination that he did not want to live at home anymore and that he wanted to live with a friend whose parents wanted him to live there. He denied grabbing Murray and tackling her to the ground

during the charged incident, but he admitted pushing Murray over a couch during the January 2015 incident.

¶ 9    After hearing A.M.'s testimony, the court granted an emergency order of protection that would remain in effect until the April 1 status hearing.

¶ 10                                    Guilty Plea

¶ 11    On April 1, 2015, Murray's counsel informed the court that Murray would plead guilty in exchange for a negotiated plea of one year of probation, a mental health evaluation, parenting classes, 100 hours of community service, and a one-year order of protection prohibiting Murray from having contact with A.M. and ordering her to stay away from him. Counsel represented that she had "extensively" advised Murray that there were "a lot of unknown consequences to agreeing to" the order of protection, that she would be giving up her right to ever possess a gun, and that she would have to "report as a violent offender for 10 years." See 730 ILCS 154/10 (West 2014) (registration requirement under the Murderer and Violent Offender Against Youth Registration Act).

¶ 12    The trial court admonished Murray in accordance with Illinois Supreme Court Rule 402 (eff. July 1, 2012). During the colloquy, Murray said she understood that she was charged with domestic battery, that she could be sentenced to probation, conditional discharge, or up to 364 days in jail, that she had a right to plead not guilty, that she had a right to a trial before a jury or a judge, and that by pleading guilty she was giving up her right to a trial, including her rights to see, hear, and question witnesses, present her own witnesses, and have the State prove her guilt beyond a reasonable doubt. She also said she understood that her guilty plea would require her to register "under the Violence Against Children Act [*sic*]" and that failing to do so would be a Class 4 felony. When the court asked Murray whether she was pleading guilty of her own free will, she answered, "Yes." The State presented, as a factual basis, that the evidence at trial would show that Murray slapped A.M. with an open hand, punched him in the face with a closed fist, and choked him with her hands around his neck. Finding that she understood the nature of the charge and the possible

penalties, that her plea was being given freely and voluntarily, and that a factual basis existed for the plea, the court accepted Murray's plea and found her guilty of domestic battery.

¶ 13    The matter proceeded immediately to sentencing, and both sides rested on the plea agreement. The court then asked Murray if she wanted to make a statement before being sentenced. She responded as follows:

> "THE DEFENDANT:  Nothing—that, I just feel that my son is coerced, and I feel like I'm not going to win this trial because it's been going on—the State never protected me in the beginning when I seeked help from them. That's why the caseworker was there.
>
> So I feel like I don't have a winning—so I'm pleading guilty because I have two other kids at home. And all of this is causing a lot of issues with my [l]upus, my health, and everything. And it's being taken away from my other two kids and they don't deserve it. So if my son doesn't want contact with me, I give up. If he doesn't want me to fight for his education and fight for him, I give up.
>
> So I'm guilty for that. And I accept my punishment. I accept my plea, and I'm guilty. I'm guilty for loving my child. Wanting my child to be in a great school. Wanting my child to do his all in school and be successful and productive in this world that black men is hard to strive in [*sic*]. I'm guilty for that. So I'm guilty. I'm guilty."

Murray's statement prompted the following exchange with the court:

> "THE COURT:  Well, okay. You have—this is obviously your opportunity to say whatever you would like to say. You certainly—and you can plead guilty for whatever reason you wish to plead guilty. From what you said to me, it certainly sounds to me, like, you feel you may have some sort of defense to this case. I don't know if that's true or not.
>
> THE DEFENDANT:   I'm tired.

THE COURT:   But if you choose to take the State's offer and plead guilty, you can do that for whatever reason you want to do that. And if you're choosing to do that today, that's fine. I will accept your plea. But you understand, I've already gone through these rights, that you do have a right to have a trial and hold the State to prove the case beyond a reasonable doubt. You understand that?

THE DEFENDANT:   No, the State has failed me already so—

[DEFENSE COUNSEL]:   Could I just have a minute?

THE COURT:   Ma'am, see when you say that, when you say the State, I'm talking about the State that's prosecuting this case. The State's Attorney's Office right now on this case. All right?

THE DEFENDANT:   I'm pleading. I'm pleading. I don't—

(Brief pause.)

THE COURT:   Okay. So the one thing that I do want to say, is you understand that, you know, having a relationship with your son and any sort of contact with him is completely different from pleading guilty to a domestic battery charge to him.

THE DEFENDANT:   That's why this is going on because my son doesn't want to live[1], I understand.

THE COURT:   But you understand that—you understand that what we're—I went through everything with you, I read you the charge?

THE DEFENDANT:   I understand.

THE COURT:   So you understand that we are dealing here today with the charge that you were charged with domestic battery to your son?

---

[1] Both the context of the case and her brief suggest that Murray was referring to her son's desire not to live with her, not a wish to be dead.

THE DEFENDANT: I understand.

THE COURT: And I understand there's also an agreement to this Order of Protection, but regardless of that Order of Protection, this is—and in the contact or no contact with the child, that this, as I said, is a plea to the domestic battery charge.

THE DEFENDANT: I understand.

THE COURT: The Class A Misdemeanor. As I've already said to you through all of the admonishments I've given you. You understand that?

THE DEFENDANT: I understand.

THE COURT: All right. So is there anything else you want to say before I sentence you?

THE DEFENDANT: No."

In accordance with the plea bargain, the court then sentenced her to one year of probation and entered a plenary order of protection that was effective for one year and, among other things, ordered Murray to stay away from and not contact A.M. and prohibited her from visiting his school or residence.

¶ 14                    Original Motion to Withdraw the Guilty Plea

¶ 15    About two weeks after the plea, on April 13, plea counsel appeared in court for Murray to ask for an order that would allow her to travel to Indiana for medical appointments. During the proceeding, counsel disclosed that, because the Calumet City Police Department did not provide a way to register as a violent offender against youth, Murray had been forced to comply with her registration requirement by registering as a sex offender, which could take as many as 60 days to get corrected in the state's database.

¶ 16    On April 28, Murray, with assistance of counsel, filed a timely motion to withdraw her plea of guilty and vacate the judgment. The motion alleged first that, on the day she pleaded guilty, Murray had been "[p]hysically ill as well as mentally ill" as a consequence of learning that, after

her previous appearance in court, the State had obtained an *ex parte* emergency order of protection against her at the request of her son, who did not want to have any further contact with her. It alleged that, due to her "acute[]" lupus and the "emotional distress over the loss of her child," Murray did not "fully comprehend" that she had a right to trial or a right to a hearing on a permanent order of protection. Second, the motion alleged that Murray did not fully understand the implications of her plea, including what it would mean to register as a violent offender and how that registration could impact her life, and that she would not have pleaded guilty "[h]ad she fully been advised of that by counsel." Third, the motion alleged that Murray had a meritorious defense to the charge based on self-defense, which would be supported by evidence showing her son's aggressive nature and previous instances of physical aggression against her. Along with the motion, counsel filed a Rule 604(d) certificate stating that she had consulted with Murray to ascertain her contentions of error in the plea of guilty, examined the court file and the transcript of the plea hearing, and prepared the motion to withdraw. See Ill. S. Ct. R. 604(d) (eff. Feb. 16, 2013).

¶ 17    On June 29, 2015, a hearing was held on the motion to withdraw the guilty plea. Murray testified on direct examination that she was not in her "right mind" on the day she pleaded guilty. She explained that, as a result of A.M. being "taken away from" her after the previous court date, she became very emotional and experienced a lupus flare-up that required her to go to the hospital. Murray testified that, when she entered her guilty plea, she did not understand the magnitude of her obligation to register as a violent offender against youth, including that it could have an effect on her career in accounting and finance. Murray also testified that the possibility of raising self-defense was only mentioned "[a]t the last minute" and that she did not "fully" understand that she might have a meritorious defense. On cross-examination, Murray elaborated on her career concerns, testifying that she had not realized that being on the registry might cause her to lose her job—and thus her ability to support her children, including A.M.—once her employer conducted a thorough background check before transitioning her to a permanent role. When she testified that she was not sure whether her attorney fully understood the registration obligation and that she felt her attorney had not "properly educated" her about it, the court construed her to be claiming that

she had been denied the effective assistance of counsel, so it paused the proceedings and continued the hearing pending the appointment or assignment of a new attorney.

¶ 18                                     Modification of the Order of Protection

¶ 19     At a court appearance related to her probation in early August 2015, Murray informed the court that A.M. had been sent to, and then kicked out of, "Lincoln Challenge" and had nowhere to live because her uncle, with whom A.M. had been living, was refusing to take him back in. On August 19, plea counsel—who was still representing Murray on all matters other than the motion to withdraw the plea—filed an emergency motion to modify the order of protection. According to the motion and to statements made by counsel in court, since the order of protection's entry, A.M. had lived first with Murray's grandparents and then with her uncle before being sent to the Lincoln Challenge in Rantoul. On July 26, he left the Lincoln Challenge and went to a hospital before going to Murray's home, where he spent the night. Murray's uncle was now refusing to take A.M. back in, and his whereabouts were unknown, although Murray believed he was living with a friend. Murray had contacted DCFS, who had informed her that it could not help her locate A.M. or ensure that he was being housed. The motion also alleged that A.M. had contacted Murray online and in person at some point after the order of protection was entered and that he had returned to Murray's home at least once since spending the night there on July 26.

¶ 20     The court held a hearing on the motion to modify the order of protection on September 9. Murray called A.M., who testified that he did not want the order of protection to be in place, that he was not afraid of Murray or his father, and that he wanted to live with Murray and for her to be able to go to his school. On cross-examination, A.M. testified that he had been living at home with his parents for about two weeks and that there had been no incidents or problems. In response to a question from the court, A.M. explained why he had changed his mind about living with his parents:

"Q.    Okay. So what made you decide—why did you change your

mind? Why, why do you now feel like you can be safe in the house?

A.   I talked to my parents, and they're the only people that can really take care of me until I'm 18.

And I don't want this—I've never wanted none of these charges against my mom. At the time I didn't—I didn't want to live with her because I wanted to do my own thing and stay with my friend, but now I see that's not the best choice, and they're the only people that can really take care of me. I really—really have my choice and interests or whatever if that make sense—

Q.   No, it makes sense. So you realize that it's not easy to be out on your own as a 17 year old?

A.   Yes.

¶ 21    The court inquired about DCFS's involvement, and the assistant state's attorney stated that DCFS had closed its investigation in December 2014 after finding that, despite an indication of abuse, the home was safe for A.M. "with minimal parental competency." Based on that finding and A.M.'s testimony, the court struck the terms of the order of protection ordering Murray to stay away from A.M., not contact him, and not visit his school or residence, but the order still prohibited physical abuse, harassment, interference with personal liberty, and stalking.

¶ 22                     Amended Motion to Withdraw the Plea

¶ 23    In June 2016, new counsel filed an amended motion to withdraw the plea and vacate the judgment. The amended motion alleged that Murray's plea was not knowing and voluntary "in that she was physically and emotionally ill when she made her plea while also having an affirmative defense of self-defense." It further alleged that Dr. Joan H. Leska, Psy.D., had examined Murray and opined that Murray's "personal vulnerabilities and stressors surrounding her pleading guilty significantly compromised her cognitive abilities to think clearly, rationally and with forethought," which meant that she "would have been unable to knowingly, intelligently, and voluntary plead guilty." Counsel also filed a Rule 604(d) certificate specifying that she had consulted with Murray

"to ascertain her contentions of error in the entry of the plea of guilty." The State filed a response arguing that the court had properly admonished Murray about her plea and that Murray's "stress" was not an adequate ground for permitting withdrawal. The court held a hearing on the amended motion in August 2016.

¶ 24     The primary witness at the hearing was Dr. Leska, who the parties stipulated was an expert in the field of forensic clinical psychology. Dr. Leska testified that she was asked to evaluate Murray to determine whether she had the ability to enter a guilty plea knowingly, intelligently, and voluntarily. She met with Murray for three hours to obtain her psychosocial, medical, and psychiatric history, to evaluate Murray's psychosocial and emotional functioning at the time of the plea, and to investigate other stressors that may have been present in Murray's life. She also spoke to plea counsel, reviewed contemporaneous medical records, and read the transcript from the plea hearing.

¶ 25     Dr. Leska identified several "psychosocial stressors" that were affecting Murray when she pleaded guilty. The first was Murray's arrest and subsequent prosecution for domestic battery. Not only was the charge a serious one, but she had never before been involved with the criminal justice system. The second was the prospect of enhanced charges. In the months after her arrest, Murray had participated in services as directed by DCFS and believed that she would be able to "plea for probation." That expectation was upset in January 2015 when her attorney told her that the State "wanted something else," which Murray understood to mean filing more serious charges against her. The third was the events of March 12, 2015, about three weeks before the plea. Murray was already upset when she arrived at court because A.M. had been behaving aggressively and calling her names at home. She was further upset when, in the hallway outside the courtroom, she got into a heated argument with the prosecutor and accused him of behaving unethically.[2] When A.M. was

---

[2]     According to plea counsel, she advised Murray after the argument that the State might pursue more serious charges. It is not clear whether Murray misremembered the date when counsel advised her about the prospect of enhanced charges or whether the subject came up on two separate occasions.

taken away to a private room, Murray became so angry that she left the courthouse against the advice of her attorney, saying that she needed to go to work. According to Murray, these events overwhelmed her and left her feeling helpless. She told Dr. Leska that she "just wanted to give up and die." By that point, she was having difficulty sleeping and eating, she was moody and irritable, and she felt like a failure. She began considering whether she should give up on A.M.—which she equated with no longer fighting in court—so she could focus on her other children.

¶ 26     As part of her evaluation, Dr. Leska also spoke to plea counsel about Murray. According to plea counsel, at the start of the representation, Murray seemed to be organized, focused, credible, and a good self-advocate. Throughout the representation, Murray would frequently express feeling shocked, disturbed, and disappointed by the system. Murray was also prone to losing her temper, generally in response to some action taken by DCFS, which would prompt her to either start arguing with counsel or simply walk out of the room. Murray was often in bed when counsel called her, which Murray attributed to her lupus being aggravated by stress. Plea counsel also told Dr. Leska about what transpired on the day of Murray's guilty plea. The matter had been set for status that day, but the State communicated a plea offer to counsel. Counsel passed the offer along to Murray and advised her to reject it, but Murray made up her mind to take the offer and plead guilty. She dismissed counsel's efforts to discuss the plea—including its consequences—and refused to talk to counsel about other options she had. According to counsel, it was as though Murray was not hearing what she was saying. Instead, Murray was preoccupied with talking about what DCFS was saying about her, the State being against her, and how the system had failed her.

¶ 27     Dr. Leska also testified that she had reviewed medical records documenting Murray's hospital visits around the time of her plea. The records confirmed that she had been undergoing treatment for lupus at Rush University Medical Center since 2012. During a follow-up visit on March 17, 2015 (after the emergency order of protection was issued but before the guilty plea), Murray complained of fatigue, anxiety, and shortness of breath. There were indications in the records that Murray had visited the emergency room at some point in March or April 2015, but there were no details or records from that visit. The records of Murray's visit on April 28, 2015,

included a physician's note stating that she was prone to experiencing significant—and sometimes disproportionate—anxiety. The doctor prescribed her an antidepressant and advised her to follow up with her primary care physician for antianxiety medication.

¶ 28    Dr. Leska testified that, based on her evaluation, she concluded that the stressors present in Murray's life at the time of her guilty plea "had affected her emotionally to the point where she was overwhelmed and anxious," which "impaired her cognitive abilities so that she was unable to *** knowingly and intelligently plead guilty." She explained that "there were really an extraordinary number of stressors that were going on in Ms. Murray's life at the time," which "were negatively affecting her emotionally and thus cognitively." She noted that Murray's cognitive impairment during that time period was evident in the medical record, her general behavior, and the transcript of the plea hearing, and she explained that the impairment was caused not only by the stressors themselves but by Murray's "own personal vulnerabilities in terms of how she manages stress and how she copes with her emotions." Dr. Leska therefore opined that, given the totality of the circumstances, Murray "would not have been able to knowingly and intelligently plead guilty to the offense of domestic battery" on the day of the plea hearing.

¶ 29    On cross-examination, Dr. Leska stated that she had testified as an expert witness in about 450 cases, the majority of which were criminal. She acknowledged that she had never testified for the State. Dr. Leska agreed that she had not diagnosed Murray with any mental illnesses or deficiencies, and she described Murray's apparent intellectual functioning as average. When asked whether Murray had not been truthful during the plea hearing when she said she understood the plea admonishments, Dr. Leska disagreed and explained that Murray's answers to yes-or-no questions were less probative of her actual state of mind than her open-ended statement in allocution, which addressed matters that were peripheral or even irrelevant to the plea of guilty such as her belief that her son had been coerced.

¶ 30    In rebuttal, the State called plea counsel, who testified that she usually discussed with clients the benefits and drawbacks of any plea offers and the consequences of going to trial versus pleading guilty and believed that she had done so with Murray. Plea counsel also testified that, at

the plea hearing, the court admonished Murray about her guilty plea and that Murray indicated that she understood the admonishments.

¶ 31     After hearing argument, the trial court found that Murray had not met her burden of justifying why she should be permitted to withdraw her plea, and it denied the motion to withdraw.

¶ 32          Appeal from Denial of Motion to Withdraw Guilty Plea

¶ 33     Murray appealed from the denial of her motion to withdraw and was appointed counsel, who filed a motion to withdraw under *Anders v. California*, 386 U.S. 738 (1967). Finding that there was a nonfrivolous argument that the trial court erred when it rejected Dr. Leska's uncontradicted testimony and noting that the trial court had not addressed Murray's self-defense claim, we denied the motion to withdraw and ordered briefing. Murray was assigned a new attorney, who filed a brief that, in addition to raising the issue concerning Dr. Leska's unrebutted testimony, argued that the attorney who filed the amended motion to withdraw had not filed a certificate in full compliance with Illinois Supreme Court Rule 604(d) (eff. Dec. 3, 2015). Without reaching the merits of the trial court's rejection of the motion to withdraw, we remanded for strict compliance with Rule 604(d). *People v. Murray*, 2020 IL App (1st) 162748-U.

¶ 34               Motion to Withdraw on Remand

¶ 35     Following remand, a private attorney appeared for Murray and filed a new motion to withdraw the guilty plea. The motion recited three grounds for withdrawal: (1) Murray did not fully understand the implications of her plea, particularly the registration requirement, and would not have pleaded guilty had plea counsel fully apprised her of the consequences; (2) Murray had a meritorious defense of self-defense, which would be supported by evidence that A.M. behaved aggressively and documentation showing that he had become physical with her on multiple other occasions; and (3) based on Dr. Leska's opinion, Murray's plea was not knowing and voluntary. Counsel filed a Rule 604(d) certificate, and the State filed a brief response contending, in effect, that the court had already rejected the same arguments.

¶ 36    The court held a hearing on the motion on October 14, 2021. The parties stipulated to the testimony at the 2016 hearing on the amended motion to withdraw the plea and made brief arguments addressing Dr. Leska's opinion. The court once again denied the motion to withdraw. Murray now appeals.

¶ 37                                        ANALYSIS

¶ 38    On appeal, Murray argues that the denial of her motion to vacate her plea should be reversed under the particular circumstances of her case, including the testimony of Dr. Leska that, insofar as multiple stressors were negatively affecting Murray physically, emotionally, and thus cognitively, at the time of her guilty plea, she did not knowingly, voluntarily, and intelligently plead guilty. She also contends that the possibility of raising self-defense was only brought to her attention "at the last minute" and, had she known she could raise that defense, she would not have pleaded guilty.

¶ 39    A defendant who pleads guilty has no absolute right to withdraw the plea and has the burden of justifying any request to do so. *People v. Canterbury*, 313 Ill. App. 3d 914, 917 (2000). Due process, however, requires that a guilty plea be entered knowingly and voluntarily. *People v. Williams*, 188 Ill. 2d 365, 370 (1999) (citing *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969)); see U.S. Const., amend. XIV, § 1; Ill. Const., art. I, § 2. A request to withdraw a guilty plea should be granted when the plea was based on a misunderstanding of the facts or the law or on misrepresentations by defense counsel. *Canterbury*, 313 Ill. App. 3d at 918. The defendant should also be permitted to withdraw a plea when there is doubt as to guilt, there is a defense worthy of consideration, or the ends of justice would be better served by having a trial. *Id.*

¶ 40    Whether to allow the defendant to withdraw a guilty plea is a decision committed to the trial court's discretion, and our review is for an abuse of that discretion. *Id.* Generally, "[a]n abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41. Although that standard is highly deferential to the trial court's decision, we

are mindful that the discretion to permit or reject a request to withdraw a guilty plea " 'should always be exercised in favor of innocence and liberty and in the light of the preference that is shown by law for a trial upon the merits by a jury.' " *People v. McKirdie*, 45 Ill. 2d 300, 302 (1970) (quoting *People v. Morreale*, 412 Ill. 528, 531 (1952)). "The withdrawal of the plea of guilty should not be denied in any case where it is evident that the ends of justice will be served by permitting the plea of not guilty in its stead." *People v. Jameson*, 387 Ill. 367, 375 (1944); see also *People v. Latsaras*, 2022 IL App (3d) 190683-U, ¶ 14 (quoting *Jameson*).

¶ 41    The thrust of Murray's argument is that Dr. Leska's uncontradicted opinion demonstrated that her plea was not knowingly and voluntarily made as she was cognitively impaired due to the multiple stressors present in her life at the time of her plea and the impact of those stressors on her based on her individual psychological makeup. We agree.

¶ 42    Dr. Leska testified that, at the time of her guilty plea, Murray was not able to make a knowing and intelligent decision about whether to plead guilty. She explained that, although Murray had been able to give appropriate answers to yes-or-no questions during the plea colloquy, her statement in allocution revealed that "her thoughts were disorganized" and that "she was making irrational and irrelevant statements" and "bringing in all kinds of issues that were irrelevant to the plea." Dr. Leska also testified that Murray's cognitive dysfunction was the result of particular stressors present in her life, the most recent of which was learning that her son A.M. no longer wanted to live with her. Dr. Leska noted that, according to plea counsel, Murray reported that the stress was aggravating her lupus symptoms, which meant that she sometimes answered counsel's phone calls from her bed. She also testified that records from Murray's visits to her doctor on March 17 and April 28, 2015—on either side of her guilty plea—reflected that she was complaining of fatigue, anxiety, and shortness of breath, which Dr. Leska explained were physical manifestations of the stress that Murray was under. Dr. Leska also explained that the stressors in Murray's life were "negatively affecting her emotionally and thus cognitively." But it was not just the stressful events and circumstances themselves. It was also how they interacted with Murray's particular psychological makeup. As noted by one of the doctors at Rush, Murray "had a propensity

for a great deal of anxiety and sometimes it was out of proportion to what the situation may be." Dr. Leska explained that Murray's cognitive abilities were "compromised" by both the circumstances of her life and "her own personal vulnerabilities in terms of how she manages stress and how she copes with her emotions and that sort of thing." In other words, Murray's unique psychological makeup meant that the effect of those stressors on her was much greater than it might have been for the average person. As a consequence of all of these circumstances unique to Murray and her life, Dr. Leska concluded that she would not have been able to knowingly and intelligently plead guilty.

¶ 43    Having reviewed the transcript of the plea hearings, we find that nothing undermines Dr. Leska's unrebutted opinion.

¶ 44    The State contends that Dr. Leska's opinion should be discounted because she failed to make a formal diagnosis of an intellectual disability, mental illness, or other psychological condition. Even so, Dr. Leska—an expert forensic psychologist—examined Murray, evaluated the available information from other sources about her cognitive functioning at the time of her plea deal, and concluded in light of her training and experience that Murray's cognitive abilities were "compromised" at the time of her guilty plea. The State cites no authority holding that the absence of a formal diagnosis invalidates that considered expert opinion.

¶ 45    The State also posits that, as a matter of law, psychological distress or emotional disturbance can never lead to a defendant being unable to make a knowing and intelligent decision to plead guilty. See *People v. Jamison*, 197 Ill. 2d 135, 157-58 (2001) (depression); *People v. Bennett*, 82 Ill. App. 3d 596, 600-01 (1980) (emotional upset and family pressure); *People v. Jones*, 74 Ill. App. 3d 243, 245-46 (1979) (emotional strain). We observe that none of the cases cited by the State involved unrebutted expert testimony that there were significant factors preventing the defendant from being able to enter a knowing and intelligent plea. In *Bennett* and *Jones*, the defendants did no more than assert that their pleas were not entered knowingly and intelligently due to stress; there is no indication that those contentions were supported by expert testimony. See *Bennett*, 82 Ill. App. 3d at 598, *Jones*, 74 Ill. App. 3d at 245. In *Jamison*, the defendant's claim that

medication he was taking for depression muddled his thinking and rendered his plea unknowing was supported by the testimony of a psychiatrist, but that expert witness only testified in general about the possible effects of the medication, never examined the defendant or reviewed his medical records, and apparently never opined as to the defendant's state of mind at the time of the guilty plea. *Jamison*, 197 Ill. 2d at 148, 150. The only evidence about the defendant, specifically, came from his treating psychiatrist, who had testified that the medication did not appear to impair the defendant's thinking. *Id.* at 146. In other words, as the court observed, "all of the psychiatric evidence indicated that [the] defendant *** *was* able to comprehend the consequences of his decision to plead guilty" (emphasis added). *Id.* at 157-58. The lesson to be taken from these cases is only that it is possible to knowingly and intelligently plead guilty even when under stress. It does not follow that there can be no circumstances under which a particular set of stressors, combined with complicating medical or psychological characteristics or other factors, might deprive a specific, individual defendant of the ability to knowingly and intelligently plead guilty, which is what Dr. Leska testified happened to Murray in this case.

¶ 46    We also reject the State's argument that Murray's refusal to consider any other options other than pleading guilty undermines Dr. Leska's conclusion that Murray was not able to plead guilty knowingly and intelligently. Plea counsel's account of Murray's behavior on the day of the plea did not describe a person who had rationally resigned herself to pleading guilty. To the contrary, she characterized Murray as being unwilling to listen to reason. Plea counsel told Dr. Leska that Murray rejected her explicit advice not to take the plea deal and that, during their conversations that day, Murray "was not hearing her" and "refused to discuss any other options." Instead, Murray was focused on "peripheral or irrelevant issues" involving DCFS, the state's attorney's office, and the "system," which she thought "had failed her." Based on plea counsel's account, Dr. Leska explained that Murray "was not attending to" or "focusing on" her options in the criminal case, which showed "that she wasn't really capable of" considering those options or "rationally think[ing] about the consequences" of pleading guilty. That, in turn, obviously supported Dr. Leska's opinion that the various stressors affecting Murray were impairing her

cognitive abilities to the point where she was not making a knowing and intelligent decision to plead guilty.

¶ 47    To this point, we have focused our analysis on Dr. Leska's opinion. We think it important to recognize, however, that there are two other circumstances in this case that weighed in favor of allowing Murray to withdraw her plea. First, although her motions to withdraw and her testimony at the June 2015 hearing did not go into detail, Murray has repeatedly asserted that, were this matter to go to trial, she might be able to defeat the charge against her by raising self-defense, suggesting that she has a defense worthy of consideration. See *Canterbury*, 313 Ill. App. 3d at 918. Second, it is apparent from the record that Murray pleaded guilty without thinking through the implications of being required to register as a violent offender against youth. In the days that followed her guilty plea, she realized that registration could affect her employability and her family's economic security, and she filed a timely motion to withdraw the plea. Putting aside whether the plea was constitutionally valid as a technical matter, it is difficult to see how the interests of justice are served by holding Murray to a plea she entered—against the advice of counsel!—when she had not fully contemplated its ramifications. We need not decide whether these two circumstances would have, in and of themselves, required allowing the motion to withdraw. These circumstances, combined with Dr. Leska's unrebutted expert opinion, leave us with the firm conviction that Murray should have been allowed to withdraw her guilty plea.

¶ 48    A plea of guilty is not valid unless "the plea was entered intelligently and with full knowledge of its consequences." *People v. Whitfield*, 217 Ill. 2d 177, 184 (citing *Boykin*, 395 U.S. at 240-244). Just as importantly, when a defendant asks to withdraw a plea, the court should always exercise its discretion in favor of innocence, liberty, and the fundamental right to hold the State to the burden of proving its allegations beyond a reasonable doubt at a trial. See *McKirdie*, 45 Ill. 2d at 302 (quoting *People v. Morreale*, 412 Ill. at 531). In this case, Dr. Leska testified without contradiction that, on April 1, 2015, Murray was not able to make the life-changing decision to plead guilty knowingly and intelligently. Furthermore, Murray had a potentially meritorious

defense. Under the specific facts and circumstances of this case, and in light of the law's preference for a trial on the merits, we hold that the denial of the motion to withdraw the plea was in error.

¶ 49                                CONCLUSION

¶ 50     We reverse the trial court's denial of Murray's motion to withdraw her plea, vacate her conviction, and remand for further proceedings.

¶ 51     Reversed in part and vacated in part; cause remanded.